**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

SICK, INC., a Minnesota corporation,

Plaintiff,

v.

MOTION CONTROL CORP., a Michigan corporation, and COMMERCE INDUSTRIAL CONTROLS, INC., a Michigan corporation,

Defendants.

Civil No. 01-1496 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Aaron F. Biber, Steven H. Silton, and Brian R. Dockendorf, MANSFIELD, TANICK & COHEN, P.A., 1700 Pillsbury Center South, 220 South sixth Street, Minneapolis, MN 55402, for plaintiff.

Barry A. O'Neil, LOMMEN, NELSON, COLE, & STAGEBERG, P.A., 1800 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendant Motion Control Corp.

Douglas L. Elsass, FRUTH, JAMISON & ELSASS, P.A., 4705 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402

Plaintiff SICK and defendant Motion Control Corp. ("MCC") are parties to a Distributor Agreement (the "Agreement"). SICK has sued defendants MCC and Commerce Industrial Controls ("CIC") for breach of contract, breach of fiduciary duty, and other claims. This matter is now before the Court on SICK's motion for a

FILED SEP 1 0 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. ________
DEPUTY CLERK ________

preliminary injunction to prevent MCC and CIC from "using and appointing CIC as a distributor and third party sales representative of SICK products." For the reasons discussed below, the Court now denies SICK's motion.

## FACTUAL BACKGROUND

SICK manufactures photoelectric sensors, safety controls, bar code systems, and other products. MCC is a Michigan corporation that distributes automobile parts and products. On October 5, 1998, SICK and MCC entered into the Agreement, in which SICK appointed MCC as its exclusive Master Distributor of SICK products in Michigan. The Agreement defines "exclusive Master Distributor" as follows:

> [T]he phrase "exclusive Master Distributor" means that SICK and Motion Control Corporation shall not, during the term of this Agreement, appoint any other Distributor or Third party sales representative for the sale of SICK Products in the Territory without mutual consent.

(Silton Aff. Ex. 1 § 4.) The Agreement also provides that it can be modified only by written consent of both parties.

CIC supplies automation controls and components to the industrial market. CIC was formerly known as MAP. MAP was founded in 1998 as a division of Mexican American Products, Ltd., and became a separate corporation in 1999. The name was changed to CIC in April 2000. CIC's majority owner is Leo Padilla, who is of Mexican descent. Because of Padilla's ownership, CIC is considered a "minority owned and controlled company" under industry guidelines. This designation permits CIC to offer "minority content" to automobile manufacturers who seek to build cars with a certain percent value contributed by minority-owned businesses.

SICK alleges that MCC created CIC as a "shell company" to sell SICK products and competing products, despite the fact that the Agreement prohibits MCC from appointing another distributor without SICK's agreement. Specifically, SICK contends that: (1) CIC is distributing and selling competing products; (2) CIC is distributing SICK products in violation of the agreement; and (3) CIC does not provide "point of sale reports." The Agreement requires MCC to provide these reports, which SICK claims it needs to maintain vital business and safety information. SICK contends that MCC acted improperly in setting up CIC, and that it did not approve of the arrangement. SICK further maintains that these circumstances are causing it irreparable harm.

MCC and CIC argue that SICK provides no evidence of irreparable harm. They particularly note that SICK first filed this action in August 2001, and did not file for the preliminary injunction until April 2002. Furthermore, defendants argue that CIC's involvement with SICK was not as a shell corporation, but rather was an arrangement designed to help SICK maintain its sales relationship with General Motors. GM was willing to purchase products from CIC to receive "minority content;" by having CIC sell its products to GM, SICK was able to maintain its sales to the car manufacturer. Defendants thus contend that SICK in fact knew of, and approved, the arrangement between itself, MCC, and CIC.

## ANALYSIS

### I. Standard of Review

In the Eighth Circuit, a preliminary injunction may be granted only if the moving party can demonstrate: (1) that the movant will suffer irreparable harm absent the preliminary injunction; (2) a likelihood of success on the merits; (3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 n.4 (8th Cir. 1987); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is considered to be a "'drastic and extraordinary remedy [which] is not to be routinely granted.'" *Taxpayers' Choice Volunteer Comm. v. Roseau County Bd. of Comm'rs*, 903 F. Supp. 1301, 1307 (D. Minn. 1995) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)); *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (cautioning that a preliminary injunction is an "extraordinary remedy"). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco*, 811 F.2d at 418.

### II. Discussion

SICK contends that it will suffer irreparable harm because: (1) MCC's agreement contained a "non-compete" covenant; (2) CIC was a shell company behind which MCC was hiding; and (3) SICK is not receiving point of sale reports from CIC.

The first of these contentions, that the Agreement contained a non-compete covenant, is not supported by the evidence. The relevant provision in the Agreement

prevents MCC from "sell[ing] or servic[ing] any type of competitive products to SICK." (Silton Aff. Ex. 1 ¶ 6.) SICK argues that this provision is governed by the Minnesota rule that irreparable harm can be inferred from breach of a non-compete covenant.

SICK accurately cites Minnesota's law on irreparable harm and restrictive covenants. *See Overholt Crop Ins. Service Co., Inc. v. Bredeson*, 437 N.W.2d 698 (Minn. Ct. App. 1989); *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085 (D. Minn. 1981). This rule, however, is confined to the area of employment contracts, and SICK's authorities deal with restrictive covenants in that context only. *See Overholt Crop Ins. Service*, 437 N.W.2d at 701-02; *Thermorama, Inc. v. Buckwold*, 125 N.W.2d 844, 845 (1964); *Gibbons*, 527 F. Supp. at 1090-91 (citing *Buckwold*, which was limited to employment contracts, for the proposition that "irreparable injury can result from a breach of a valid non-competition clause"). The Agreement here clearly is not an employment contract, and SICK does explain why it should be treated as such. Therefore, this contention does not support a finding of irreparable harm.

The second contention, that CIC is a shell company, may bear upon the issue of breach, but does not bear upon whether SICK suffers irreparable harm. Even if the Court were to accept SICK's contention that MCC breached the agreement by setting up CIC, SICK does not explain why CIC's selling SICK products[1] causes **irreparable** harm. SICK has alleged that such sales harm its goodwill and business reputation, but has not explained or supported this allegation.

---

[1] Although SICK makes frequent reference to CIC's sales of competing products, SICK asks the Court only to enjoin sales of SICK's own products.

SICK's most specific allegation relates to the point of sale reports. SICK notes that these reports track the locations of its safety products around the country. Because one of these safety devices could malfunction, SICK contends, the company needs the reports to track its potential liability. SICK also argues that the reports allow it to "understand its . . . market and make sound business decisions." (Pl. Reply at 5.) While these are laudable business goals, SICK's potential inability to meet them does not constitute irreparable harm.

Because the Court finds that SICK will clearly not suffer irreparable harm, SICK cannot meet the requirements for a preliminary injunction. Therefore, it is unnecessary to analyze the remaining *Dataphase* factors.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff SICK's Motion for Preliminary Injunction [Docket No. 42] is **DENIED.**

DATED: September 10, 2002
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge