**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| SICK, INC., | Civil No. 01-1496 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING DEFENDANT MOTION CONTROL CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION** |
| MOTION CONTROL CORP., and COMMERCE INDUSTRIAL CONTROLS, INC., | |
| Defendants. | |

---

Steven H. Silton, V. John Ella, and Aaron F. Biber, MANSFIELD, TANICK & COHEN, P.A., 1560 International Centre, 900 Second Avenue South, Minneapolis, MN, 55402-3383, for plaintiff.

Barry A. O'Neil and Harry Kennedy, LOMMEN, NELSON, COLE & STAGEBERG, P.A., 1800 IDS Center, 80 South Eighth Street, Minneapolis, MN, 55402, for defendant Motion Control Corporation.

Defendant Motion Control Corporation ("MCC") moves for a preliminary injunction to restrain plaintiff SICK, Inc. ("SICK") from interfering with, altering or taking action to terminate a 1998 Distributor Agreement between the parties and to restrain SICK from engaging in direct sales of its products in Michigan. For the reasons that follow, the Court denies the motion.

FILED SEP 07 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. ____
DEPUTY CLERK ____

## BACKGROUND

SICK is a Minnesota corporation engaged primarily in the business of manufacturing photoelectric sensors, safety controls and bar code systems, among other products. MCC is a Michigan corporation engaged in the business of distributing automobile parts and products.

### A. The Distributor Agreement

On October 5, 1998, after nearly a year of negotiations, the parties entered into a Distributor Agreement (the "Agreement") in which SICK appointed MCC as its exclusive Master Distributor of SICK products in Michigan. The Agreement defines "exclusive Master Distributor" as follows:

> [T]he phrase "exclusive Master Distributor" means that SICK and Motion Control Corporation shall not, during the term of this Agreement, appoint any other Distributor or Third party sales representative for the sale of SICK Products in the Territory without mutual consent.

Agreement § 4. The Agreement also provides the term and conditions upon which the parties may terminate the Agreement. Section 13 of the Agreement, entitled Term and Termination, begins by stating that "[t]he term of this Agreement shall commence October 5, 1998, and shall terminate on October 5, 1999, unless extended as provided for below." The section then continues:

> The terms of this Agreement shall be automatically extended by one (1) additional year unless either party hereto shall give the other party written notice not less than ninety (90) days during the then running year of its desire to terminate this Agreement; provided, however, SICK shall be precluded from terminating this Agreement as long as Distributor has:
>
> 1. met the yearly sales goals mutually set by SICK and Distributor;

> 2. devoted its best efforts, knowledge and skill to the furtherance of SICK's business within the Territory;
>
> 3. aggressively promoted SICK's name and the sales of SICK Products within the Territory;
>
> 4. used it[s] best efforts to maintain volume of sales consistent with the market in the Territory; and
>
> 5. complied with the terms and conditions of this Agreement.
>
> If SICK provides Distributor a timely notice of non-renewal of this Agreement and Distributor desires to keep this Agreement in effect, then within twenty (20) days after receipt of the notice of non-renewal from SICK (and before commencement of arbitration), Distributor shall provide SICK written confirmation which substantiates, in reasonable detail, Distributor's compliance with each of the items 1-5 described in this paragraph. If Distributor does not provide such timely confirmation to SICK, this Agreement shall terminate effective as of the end of the 90-day period referred to above and shall not be renewed.

This section further provides that "[i]n the event SICK intends to terminate the Agreement based on the allegation of inadequate performance by Distributor, [MCC] may, as its sole and exclusive remedy and if acting in good faith, submit the issue in question to informal binding arbitration." Agreement § 13, ¶ 4.

**B. SICK's Direct Sales**

In entering this Agreement, MCC terminated a long-term distributorship relationship with Dolan-Jenner, a competitor of SICK. MCC contends that it was its understanding and expectation that SICK would not make direct sales to customers in Michigan during the term of the Agreement. To support this argument, MCC emphasizes that during contract negotiations, SICK proposed language in the Agreement which

would have expressly preserved SICK's right to engage in direct sales. Specifically, this provision provided: "This Agreement shall not prohibit SICK or its other distributors from selling or servicing SICK's Products in the Territory so long as SICK's other distributors are not acting as Master Distributor in the Territory." MCC refused to agree to SICK's proposal.

According to SICK, both the contractual language in the final agreement and the contract negotiations make clear that SICK is not prevented from engaging in direct sales in MCC's territory. SICK emphasizes that the original draft distribution agreement forwarded by MCC contained a proposed provision which would have restricted SICK's sale of its products in the territory. Specifically, the draft agreement provided that "nor shall Manufacturer sell Products to any person or entity if Manufacturer has actual knowledge that such products are being purchased for sale in the territory or to the Customers." SICK President Mark Penning demanded that this provision be removed, which it was. On August 4, 1998, MCC again requested to reinsert this language into the Agreement, but SICK again rejected this request. The draft agreement also provided that the "[m]anufacturer shall not, during the term of this Agreement appoint any other distributor or **sales representative** for the sale of Products in the Territory." (Emphasis added.) To prevent the term "sales representative" from being interpreted to apply to SICK's own sales people and limit its own sales activity, the term was replaced by the term "third party sales representative" to ensure it did not include SICK, or any of its employees.

During late 1999 and into early 2000, SICK began hiring personnel in MCC's territory. MCC contends that instead of providing assistance and support for MCC's sales force as required under the Agreement, SICK's new employees began making direct sales in an effort to take over MCC's largest accounts.[1] These actions by SICK, MCC argues, completely undermines the exclusivity of MCC's distributorship and irreparably harms MCC's business relationship with its customers.

**C. SICK's Attempts to Terminate the Agreement**

On September 28, 2000, SICK notified MCC that it intended to terminate the Agreement due to MCC's alleged inadequate performance of its obligations under the Agreement. In response to SICK's notice of termination, MCC twice requested clarification of the grounds for termination, which SICK provided on November 6, 2000. On December 4, 2000, MCC demanded arbitration of the allegations of inadequate performance pursuant to the terms of the Agreement. Accordingly, the grounds for termination identified by SICK in its September 28, 2000 letter were presented to a panel of three arbitrators in July 2001.

On August 3, 2001, the arbitrators rendered their decision. The arbitrators found that MCC had failed to perform two of SICK's five allegations of non-performance, however, the arbitrators concluded that SICK failed to adequately inform MCC of the steps it needed to take to cure these violations under the Agreement in its September 28,

[1] According to SICK, other than the brief period between June 13, 2001 and August 15, 2001 when it was enjoined by a Michigan state court from making direct sales, SICK has never not made direct sales.

2000 Notice of Termination and November 6, 2000 clarification letter. The arbitrators thus concluded that SICK's attempt to terminate the Agreement was not justified and that the Agreement continues in effect.

On July 2, 2001, while the arbitration proceeding was pending, SICK timely notified MCC of its intention not to renew the Agreement upon the annual expiration date of October 5, 2001. The notice identified the same grounds that were being arbitrated for the 2000 term of the Agreement, along with two additional grounds. To prevent non-renewal of the Agreement, MCC responded to SICK's notice of termination on July 20, 2001. In this letter, MCC provided written confirmation substantiating its compliance with the Agreement and also demanded arbitration of the allegations of inadequate performance.

**D. The Federal Action**

SICK commenced this action on August 16, 2001 alleging claims against MCC for breach of contract, breach of fiduciary duty, tortious interference with contractual relations, unjust enrichment, and breach of the covenant of good faith and fair dealing. These claims arise out of SICK's contention that MCC breached the Agreement by selling competing products of SICK through a shell company MCC created called Commerce Industrial Controls, Inc. On August 24, 2001, MCC answered SICK's complaint and also counterclaimed against SICK alleging, *inter alia*, breach of contract and breach of fiduciary duty claims. According to MCC, it is SICK who is in breach of

the Agreement by, among other things, making direct sales to customers in Michigan and by failing to assist MCC in the sale of its products to Michigan customers.

MCC also moved for a temporary restraining order and preliminary injunctive relief and that motion is the focus of this Order. Specifically, MCC seeks to enjoin SICK from interfering with, altering or taking action to terminate the distributor Agreement and to restrain SICK from engaging in direct sales to Michigan customers in breach of the Agreement. Having considered the parties' briefs and arguments of counsel, the Court denies MCC's motion.

## ANALYSIS

### I. Preliminary Injunction

#### A. Standard of Review

In the Eighth Circuit, a preliminary injunction may be granted only if the moving party can demonstrate: (1) that the movant will suffer irreparable harm absent the preliminary injunction; (2) a likelihood of success on the merits; 3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 n.4 (8th Cir. 1987); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is considered to be a "'drastic and extraordinary remedy [which] is not to be routinely granted.'" *Taxpayers' Choice Volunteer Comm. v. Roseau County Bd. of Comm'rs,* 903 F. Supp. 1301, 1307 (D. Minn. 1995) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)); *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.,* 815 F.2d 500, 503 (8th Cir.

1987) (cautioning that a preliminary injunction is an "extraordinary remedy"). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco*, 811 F.2d at 418.

**B. Irreparable Harm**

MCC argues that it will be irreparably harmed if SICK is not enjoined from terminating this Agreement and restrained from making direct sales in MCC's territory. Relying on a trio of dealership cases, *Lano Equip. Inc v. Clark Equip. Co.*, 399 N.W.2d 694 (Minn. Ct. App. 1987); *Dahlberg Brothers Inc. v. Ford Motor Co.*, 137 N.W.2d 314 (Minn. 1965); *John Peterson Motors Inc v. General Motors Corp.*, 613 F. Supp. 887 (D. Minn. 1985), and a distributorship decision from the Eighth Circuit, *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671 (8th Cir. 1985), MCC contends that its business will be destroyed and it will be financially unable to litigate this dispute if it fails to obtain the injunctive relief it seeks.

SICK alleges that no irreparable harm will result because MCC has an adequate remedy at law. MCC asserts an entitlement to monetary damages in each of its counterclaims and never asserts that it is entitled to specific performance of the Agreement. Thus, even if MCC can prove any of its counterclaims in this case, any losses MCC suffers in the interim are measurable in damages.

In all cases considering the factors for determining whether to grant injunctive relief, "the threshold inquiry is whether the movant has shown the threat of irreparable injury." *Gelco Corp v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1999). The failure

to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction. *Id.* at 420; *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 2999 (8th Cir. 1996). Courts have consistently held that where the moving party has an adequate remedy at law, a preliminary injunction is inappropriate. *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989); *Pieper v. United States,* 604 F.2d 1131, 1134 (8th Cir. 1979); *Bonner v. City of St. Louis,* 526 F.2d 1331, 1334 (8th Cir. 1975) (failure to demonstrate irreparable harm and lack of an adequate remedy at law, indispensable prerequisites for equitable relief, warrants denial of plaintiffs' motion for an injunction).

The Court finds that MCC has not sustained its burden of proving a "'clear showing of immediate irreparable injury'" if an injunction does not issue. *Taxpayers,* 903 F. Supp. at 1308 (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 224 (3d Cir. 1987)). At bottom, this is a straightforward breach of contract dispute in which MCC alleges that SICK is in breach of the Agreement by making direct sales of its products in Michigan. Money damages can adequately compensate MCC if it should prevail on the merits of its claims.

The factual circumstances of this case are similar to those in two cases relied on by SICK, *Crowley Beverage Co. v. Miller Brewing Co.*, 1985 U.S. Dist. LEXIS 20554 (D. Minn. 1985) and *O.M. Droney Beverage Co. v. Miller Brewing Co.*, 365 F. Supp. 1067 (D. Minn. 1973). In both cases, the courts denied the distributor's motion to enjoin the manufacturer from terminating its distributor agreement on the basis that the distributor had an adequate remedy at law. In *Crowley*, the plaintiff was an exclusive

distributor for defendant Miller Brewing Company, a manufacturer of various types of beer. *Id.* at *2. The distributor agreement permitted Miller to terminate the agreement with 90 days notice on the basis of Crowley's noncompliance with the agreement's performance terms. When Miller sought to terminate the agreement, Crowley disputed whether it had in fact failed to perform under the agreement and sought to enjoin Miller from terminating the agreement until a determination on the merits was made. *Id.* at *3-5. The district court denied the distributor's motion on the basis that Crowley failed to demonstrate irreparable harm. *Id.* at *6-7. Relying on *O.M. Droney*, the court determined that "if Miller has wrongfully terminated the agreement, Crowley's injuries are wholly compensable by money damages." *Id.* at *7-9.

The Court is also not persuaded that MCC's entire business will be eliminated if SICK is not enjoined from terminating the Agreement or conducting direct sales. MCC acknowledges that the sale of SICK products account for roughly 41-51% of its business revenue. Thus, even in the worst scenario, damages that could result to MCC are the loss of a portion of its business.[2] Courts have held that the loss of a portion of a distributor's business which was compensable in money damages does not amount to irreparable harm. *Crowley*, 1985 U.S. Dist. LEXIS 20554 at *7 (no irreparable harm from termination of distributor agreement where sale of manufacturer's products accounts for only 45% of distributor's annual sales); *O.M. Droney*, 365 F. Supp. at 1070 (no

[2] It is not even certain that MCC will lose all of SICK's business in the absence of an injunction. The separate issue of whether SICK is justified in terminating the Agreement based on MCC's inadequate performance is yet to be resolved in arbitration.

irreparable harm despite the fact manufacturer's products comprise the majority of distributor's business); *P.J. Grady, Inc. v. General Motors Corp.*, 472 F. Supp. 35 (E.D.N.Y. 1979) (loss of part of plaintiff's business was compensable in money damages).

These facts stand in contrast to *Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671 (8th Cir. 1985), a distributorship case relied on by MCC. In *Ryko*, the distributor presented much more compelling evidence that it would be irreparably harmed if the distributor agreement were allowed to terminate. There, sales and services of the manufacturer's products accounted for 95% of the distributor's business. *Id.* at 673. Thus, on this record, MCC has simply failed to establish irreparable harm.

### C. Likelihood of Success on Merits

Even though MCC's failure to demonstrate irreparable harm is a sufficient basis to deny MCC's motion, other factors of the *Dataphase* test do not weigh in MCC's favor. At this point, MCC's likelihood of success on the merits is far from clear. At the core of MCC's counterclaims is the issue of whether or not the Agreement prohibits SICK from engaging in direct sales in Michigan. Section 4 of the Agreement, which arguably controls this issue, provides that:

> SICK hereby appoints Motion Control Corporation as its exclusive Master Distributor for sales, in the above described Territory for the Photo Electric Sensors, Inductive Sensors, Safety Control and Bar Code Systems (the "SICK Products"). As used in this section, the phrase "exclusive Master Distributor" means that SICK and Motion Control Corporation shall not, during the term of this agreement, **appoint any other Distributor or Third party sales representative for the sale of SICK Products** in the Territory without mutual consent.

Agreement §4, ¶ 4 (emphasis added). The above-section does not affirmatively preclude SICK from directly selling its own products and the limitations placed on SICK only preclude SICK from appointing other distributors or **third party** sales representatives. (Emphasis added.)

MCC emphasizes, however, that SICK has a duty under the Agreement to assist and support MCC in the sale of its products in the territory. Directly selling to customers in Michigan, MCC argues, is certainly not supporting or assisting MCC's sales efforts. While this argument does make it a closer question as to whether SICK is precluded from directly selling its products under the Agreement, it is not enough, standing alone, to persuade the Court that the probability of success on the merits strongly favors MCC. At most, the evidence creates an ambiguity in the Agreement. However, even if the Court were to find the contract ambiguous on this point, the extrinsic evidence submitted by the parties regarding the negotiations on this issue are clearly in dispute and fail to resolve the issue one way or the other.

For all the above-stated reasons, the Court denies MCC's motion for injunctive relief. MCC has an adequate remedy at law for the counterclaims it raises in this litigation and at this point in the proceedings, it is difficult to predict accurately who will ultimately prevail on the merits of these claims. As for the termination issue that must be resolved in arbitration, the Court urges the parties to arbitrate this issue as expeditiously as possible. SICK acknowledges its contractual obligation to arbitrate this issue and has represented to the Court that it is ready and willing to do so. Indeed, it is in SICK's

interest under the contractual terms of the Agreement to arbitrate if it hopes to terminate the Agreement. Accordingly, MCC's motion for a preliminary injunction is denied.

**ORDER**

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that defendant Motion Control Corporation's Motion for Temporary Restraining Order and Preliminary Injunction [Docket No. 3] is **DENIED**.

DATED: Sept. 7, 2001
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge

**Please forward this announcement to the recipient of this fax.**

---

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500