**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

SICK, INC., a Minnesota corporation,

Plaintiff,

v.

MOTION CONTROL CORP., a Michigan corporation, and COMMERCE INDUSTRIAL CONTROLS, INC., a Michigan corporation,

Defendants.

Civil No. 01-1496 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER UPON RECONSIDERATION OF PREVIOUS ORDER**

---

Aaron F. Biber, Steven H. Silton, and Vincent J. Ella, MANSFIELD, TANICK & COHEN, P.A., 1700 Pillsbury Center South, 220 South Sixth Street, Minneapolis, MN 55402, for plaintiff.

Barry A. O'Neil, LOMMEN, NELSON, COLE, & STAGEBERG, P.A., 1800 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, and Harry Kennedy, KENNEDY LAW OFFICE, 12613 Flint Street, Overland Park, KS 66213, for defendant Motion Control Corporation.

Douglas L. Elsass, FRUTH, JAMISON & ELSASS, P.A., 3902 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendant Commerce Industrial Controls, Inc.

Plaintiff SICK has sued defendants Motion Control Corp. ("MCC") and Commerce Industrial Controls ("CIC") for breach of contract and other claims stemming from a distributor agreement between SICK and MCC. MCC has counterclaimed against

FILED JUN 19 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. ______
DEPUTY CLERK ______

SICK, also alleging breach of contract and other claims. On March 31, 2003, the Court issued a brief order: (1) granting SICK's motion for summary judgment on MCC's counterclaims; (2) denying CIC's motion for summary judgment and to dismiss; and (3) denying MCC's motion for summary judgment. The Court has now reconsidered its ruling on CIC's motion for summary judgment, and now issues this memorandum opinion and order on that motion, and providing the reasoning behind the Court's other rulings.

## BACKGROUND

### I. Factual Background

SICK manufactures photoelectric sensors, safety controls, bar code systems, and other products for the automobile industry. MCC is a Michigan corporation that distributes automobile parts and products. On October 5, 1998, SICK and MCC entered into a distributorship agreement (the "Agreement"), under which SICK appointed MCC as its exclusive Master Distributor of SICK products in Michigan. The Agreement defines "exclusive Master Distributor" as follows:

> [T]he phrase "exclusive Master Distributor" means that SICK and Motion Control Corporation shall not, during the term of this Agreement, appoint any other Distributor or Third party sales representative for the sale of SICK Products in the Territory without mutual consent.

(Quaine 8/24/01 Aff. Ex. 1 ("Agreement") § 4.) The Agreement term was for one year, which would be automatically extended for another year unless one party provided

written notice of its intention not to renew at least 90 days prior to the end of the then-running Agreement year. SICK could not exercise this provision unless MCC failed to meet certain conditions. The Agreement also provides that it can be terminated by either party upon 30 days written notice for failure to perform any obligations under the Agreement.

CIC supplies automation controls and components to the industrial market. CIC was formerly known as MAP Industrial Controls. This company was founded by several people involved with MCC: Russell Quaine, MCC's president, Paul Karty of MCC, Leo Padilla ("Padilla"), and two other individuals. Padilla is the president and majority shareholder in CIC. Padilla is of Mexican descent, and CIC is therefore considered a "minority owned and controlled company" under industry guidelines. This designation permits CIC to offer "minority content" to automobile manufacturers who seek to build cars with a certain percent value contributed by minority-owned businesses.

## II. Procedural Background

On September 28, 2000, SICK notified MCC that it intended to terminate the Agreement due to MCC's alleged inadequate performance. MCC demanded arbitration as provided for in the Agreement, and SICK's grounds for termination were presented to a panel of three arbitrators in July 2001. On August 3, 2001, the arbitrators rendered their decision, finding that MCC had failed to perform some of its obligations. The arbitrators also concluded, however, that SICK never adequately informed MCC of how

to cure these violations. The arbitrators thus concluded that SICK's attempt to terminate the Agreement was not justified and that the Agreement continued in effect. (*See* Quaine 8/24/01 Aff. Ex. 2 ("Arbitration Panel Award").)

SICK then filed this action on August 16, 2001, alleging that MCC breached the Agreement. MCC filed its Answer and Counterclaim on August 24, 2001, and moved at the same time for an injunction preventing SICK from altering or terminating the Agreement, and preventing SICK from directly selling its own products in Michigan. On September 7, 2001, this Court denied MCC's motion for an injunction. *See SICK, Inc. v. Motion Control Corp.*, Civ. No. 01-1496, 2001 WL 1640055 (D. Minn. Sept. 7, 2001).

On July 2, 2001, SICK gave MCC notice of its intention not to renew the Agreement upon the annual renewal date of October 5, 2001. MCC timely responded to this notice, demanding arbitration. In December 2001, the parties again entered arbitration, this time before a single arbitrator, Richard B. Solum ("Solum"). Arbitrator Solum issued his decision on April 1, 2002, and found that both parties had failed to perform aspects of the Agreement. (*See* O'Neill 6/17/02 Aff. Ex. 3 ("Solum I").) He also determined that the Agreement had not been terminated, and should remain in effect until 2004 so that MCC could recoup some of the returns it reasonably expected from its relationship with SICK. On April 22, 2002, MCC asked Solum to reconsider certain aspects of his ruling, and on May 6, 2002, Solum denied MCC's request. (*See* O'Neill 7/3/02 Aff. Ex. 13 ("Solum II").)

On May 8, 2002, SICK filed its current First Amended Complaint ("Amended Complaint"). In June 2002, SICK sought a preliminary injunction to prevent MCC and CIC from distributing SICK products through CIC. The Court denied this Motion on September 10, 2002.

In July 2002, SICK filed a notice of removal, removing to this Court an action filed by MCC in Hennepin County District Court that sought to modify or vacate Arbitrator Solum's award (the "Second Action"). On July 29, MCC filed a motion to remand the Second Action to Hennepin County District Court. On March 31, 2003, this Court denied MCC's motion to remand the Second Action to state court, and denied MCC's motion to modify or vacate Arbitrator Solum's award. *See Motion Control Corp. v. SICK, Inc.*, Civ. No. 02-1661, slip op. at 18 (D. Minn. March 31, 2003).

Also on March 31, 2003, the Court granted SICK's motion for summary judgment on MCC's counterclaim, and denied motions for summary judgment against SICK by MCC and CIC.

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc*., 285 F.3d 688, 691 (8th Cir. 2002).

## II. SICK's Motion for Summary Judgment

MCC has asserted counterclaims against SICK for breach of contract, breach of fiduciary duty, unjust enrichment and/or conversion, tortious interference with business

relationships, and promissory estoppel.[1] SICK seeks summary judgment on all of MCC's counterclaims for the following reasons: (1) MCC's counterclaims were all fully addressed by Arbitrator Solum and therefore are barred under the doctrine of *res judicata*; (2) the Agreement provides that MCC's sole remedy for breaches by SICK is through arbitration, so MCC's counterclaims are barred under the doctrine of election of remedics; (3) MCC's claims for lost profits are explicitly barred by the Agreement; (4) SICK's direct sales of its own products are not barred by the Agreement; (5) MCC's tort claims are barred by the "economic loss" doctrine, because the Agreement is a contract for goods under the Uniform Commercial Code; and (6) MCC's promissory estoppel claim is improper because such claims are only proper in the absence of an actual contract.

**A. Res Judicata**

SICK contends that Arbitrator Solum's decision and award resolved all the relevant issues that MCC raises in its counterclaims, and those claims are therefore barred under the doctrine of *res judicata*. This doctrine bars a party from asserting a claim if three requirements are met: (1) the prior judgment was entered by a court of competent jurisdiction; (2) the decision was a final judgment on the merits; and (3) the same cause of action and the same parties were involved in both cases. *Val-U Construction Co. of*

---

[1] MCC also sought injunctive relief. This was addressed in the Court's order of September 7, 2001.

*So. Dakota v. Rosebud Sioux Tribe*, 146 F.3d 573, 581 (8th Cir. 1998). The Eighth Circuit has held that an arbitrator's award can constitute a final judgment for purposes of *res judicata*. *Id.* at 581-82; *American Federation of Television & Radio Artists Health & Retirement Funds v. WCCO Television, Inc.*, 934 F.2d 987, 991 (8th Cir. 1991).

MCC contends that its claims are not barred because Arbitrator Solum did not consider its claims for damages.[2] MCC argues that Solum's decision was limited to the issue of "whether or not SICK could terminate or non-renew [sic] the Agreement on grounds of 'inadequate performance' by MCC." (MCC Br. at 15.) This goes to the arbitration's scope, a question already settled by this Court's order denying MCC's motion to modify or vacate. *See Motion Control Corp. v. SICK, Inc.*, Civ. No. 02-1661, slip op. at 11-13 (D. Minn. March 31, 2003) (the "March 31 Order"). In that Order, the Court determined that Arbitrator Solum received a broad mandate from the parties to grant any remedy or relief that he deemed just and equitable, and that the arbitration's scope was not as circumscribed as MCC contended. *See id.* at 11. The Court also firmly rejected MCC's contention that Arbitrator Solum was without power to order the recoupment remedy that he crafted.[3] *Id.* at 12. The Court concluded that "a full range of

---

[2] MCC also contends that *res judicata* does not apply because Arbitrator Solum's decision is not a final decision on the merits. This argument rested upon MCC's then-pending motion to modify or vacate the arbitration award. Because the Court has since denied that motion, MCC's contentions in this regard are moot.

[3] MCC argues that Arbitrator Solum, while referencing the doctrine of recoupment, did not actually consider his remedy to be one of recoupment. MCC also contends that even if Solum did award recoupment, such an award would be contrary to Minnesota law. Neither of

(Footnote continued on next page.)

issues surrounding termination of the Agreement – not just the termination itself -- was submitted to Arbitrator Solum [and] thus served as valid bases for his decision and award." *Id.* The Court further determined in its March 31 Order that Arbitrator Solum's remedy – imposing a March 31, 2004 termination date on the Agreement – was within his authority and could not be altered without undermining the decision. *Id.* at 12-13.

Thus, the Court has already found that Arbitrator Solum considered all the outstanding issues in MCC's counterclaims, and crafted a remedy designed to provide some relief to both parties while concluding the matter "without further litigation." (Solum I at 11.) Arbitrator Solum granted MCC its full measure of relief in this case and, as the Court has already determined, that decision is final. Accordingly, the Court agrees with SICK that MCC's counterclaims in this case are barred as *res judicata*.

(Footnote continued.)
these contentions has merit here. First, it is clear from a reading of Arbitrator Solum's two decisions that he did consider his award to be in the nature of recoupment for MCC. (*See* Solum I at 11; Solum II at 3.) Second, even if Solum's decision is "misplaced" or contrary to Minnesota law – and MCC has not so proven – this is not sufficient to invalidate his award. "The arbitrator 'is the final judge of both law and fact,' and an award 'will not be reviewed or set aside for mistake of either law or fact in the absence of fraud, mistake in applying its own theory, misconduct, or other disregard of duty.'" *Hunter, Keith Industries, Inc. v. Piper Capital Mgmt., Inc.*, 575 N.W.2d 850, 854 (Minn. Ct. App. 1998) (quoting *Cornoyer v. American Television & Radio Co.*, 83 N.W.2d 409, 411 (Minn. 1957)). Arbitrator Solum had broad authority to craft a remedy beyond that which a Court could impose, and this Court has already determined that Solum did not exceed that authority. *See* March 31 Order at 16-17.

### B. Election of Remedies

SICK argues that MCC's counterclaims are also barred under the doctrine of election of remedies. Under this doctrine, a party chooses "between different remedies allowed by law on the same state of facts, where the party has but one cause of action, one right infringed, one wrong to be redressed." *Popp Telecom v. American Sharecom, Inc.*, 210 F.3d 928, 934 (8th Cir. 2000) (quoting *Geo. A. Hormel Co. v. First Nat'l Bank*, 212 N.W. 738, 740-41 (Minn. 1927)). The purpose of this doctrine is "to prevent double redress for a single wrong." *Vesta State Bank v. Independent State Bank of Minn* , 518 N.W.2d 850, 855 (Minn. 1994). Specifically, SICK argues that MCC chose arbitration as its exclusive remedy to litigate any attempted termination of the Agreement by SICK. The Agreement provides:

> In the event SICK intends to terminate the Agreement based on the allegation of inadequate performance by [MCC], [MCC] may, as its sole and exclusive remedy and if acting in good faith, it shall immediately submit the issue in question to informal binding arbitration at Minneapolis, Minnesota.

(Agreement § 13.)

MCC argues that the arbitration provision was not intended to address damages, again contending that the question of damages was not submitted for arbitration. This argument relies entirely upon MCC's narrow view of the arbitration's scope, which this Court has already rejected. *See supra*, Part II.A. MCC now improperly seeks to bifurcate the arbitration between the sole question of termination and MCC's purported "right to obtain damages for SICK's multiple breaches of the Agreement that were not

related to SICK's improper attempts to terminate the distribution relationship."[4] (MCC Br. at 20.) As this Court has already determined, Arbitrator Solum had authority to determine all issues related to termination, and he rendered a complete and indivisible decision on all the merits of MCC's counterclaims. The Court thus finds that MCC cannot escape its chosen remedy; having sought and received arbitration, MCC must live with the results.

### C. Lost Profits

SICK also contends that the Agreement bars MCC's counterclaims for lost profits. Section 15 of the Agreement provides: "IN NO EVENT SHALL SICK OR [MCC] BE LIABLE TO EACH OTHER FOR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS . . . ." (Agreement § 15.) SICK notes that MCC's own expert described all of MCC's claimed damages as lost profits. (*See* Silton 6/27/02 Aff. Ex. 9 at 2-3.)

MCC argues that reading the Agreement to preclude lost profits is absurd, and must therefore be avoided under conventional principles of contract interpretation. MCC states that "any damage claim for a breach of the Agreement would necessarily include a component of lost profits for either party to be made whole," and that to read the Agreement as barring lost profits would prevent the parties from being made whole in the

[4] MCC also asserts that the arbitration "vindicated . . . its right not to be terminated for the 2002 term" of the Agreement. (MCC Br. at 20.) This is simply not true. In fact, the arbitrator found precisely the opposite, stating that "MCC is incorrect in its view that the Decision and Award found for MCC in respect to whether or not the distributorship should be terminated." (Solum II at 2.)

case of breach. (MCC Br. at 21.) This, MCC argues, would be an absurd result, so naturally the Agreement must not prohibit lost profits. This argument is founded solely on conjecture. It not only ignores the plain text of the Agreement, but also makes unsupported assumptions about the parties' intentions. The Court therefore finds this argument without merit.

The Court also rejects MCC's contention that the bar on lost profits does not apply to actions between MCC and SICK. MCC claims that because Section 15 is titled "Indemnification," the bar must not apply to actions between the two parties. This also ignores the plain language of the Agreement. Section 15 deals primarily with situations in which SICK or MCC agree to indemnify each other against actions by some third party. Such indemnification, of course, could not result in either SICK or MCC being liable to each other for lost profits. Thus, for the provision to have any meaning at all, the Court must presume that the provision means what it plainly states: "in no event" shall SICK or MCC be liable to each other for lost profits. *See Opus Corp. v. International Business Machines, Inc.*, 141 F.3d 1261, 1266 (8th Cir. 1998) ("[U]nder Minnesota law we are obligated to avoid a contract interpretation that would render a provision of the contract meaningless.") The Court finds that the context of the Agreement supports a total bar on lost profits, and concludes that MCC's counterclaims for damages are barred on this ground as well.

**D. SICK's Direct Sales**

Next, SICK argues that MCC's claims for damages must fail because they are based exclusively on SICK's direct sales of its own products in Michigan. SICK contends that the Agreement does not bar such sales. MCC asserts that its counterclaims are not limited to this question, and argues that a genuine issue of material fact remains as to the Agreement's meaning on direct sales.

The Court finds that neither party is entirely correct on this point. As the Court noted in its March 31, 2003 Order granting SICK's motion for summary judgment, Arbitrator Solum clearly rendered a decision on the extent to which the Agreement regulates SICK's direct sales. (*See* O'Neill 6/17/02 Aff. Ex. 3 at 6.) The arbitrator stated that the

> Agreement and its express and implied terms, after the construction of any ambiguities around this issue, precludes SICK itself . . . from direct selling activities (including pricing activities) **which would materially hinder MCC's ability to realize both parties' . . . intended expectations** relative to MCC's distributorship in Michigan.

(*Id.*) (emphasis added) (footnotes omitted).

Given this interpretation, the Court cannot agree with SICK that the Agreement does not prohibit direct sales. At the same time, MCC is incorrect in stating that an issue of material fact remains as to the Agreement's meaning on direct sales. The arbitrator squarely and completely addressed this question, and the Court finds that his Decision and Award is therefore *res judicata*. The Court's previous order thus granted summary judgment on this ground, settling the question of direct sales as the arbitrator left it.

**E. Economic Loss**

SICK next argues that MCC's counterclaims in tort are barred by the "economic loss" doctrine. This doctrine bars tort claims in actions under Article 2 of the Uniform Commercial Code ("U.C.C."). *See AKA Distributing Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1085 (8th Cir. 1998). SICK contends that the Agreement is a contract for goods under Article 2, and therefore MCC's tort claims are barred. MCC contends that there is at least a genuine issue of material fact as to whether the Agreement is for goods or for services.

Minnesota courts use a "predominant purpose" test to determine whether a contract is for goods or for services. *Id.* This test considers whether the purpose of the contract "is the rendition of service, with goods incidentally involved (e.g., contract with artist for a painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom). *Id.* (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)). Under this test, courts generally hold that distributorship contracts – like the Agreement in this case – are contracts for the sale of goods and therefore fall under Article 2 of the U.C.C. *Id.*; *Ralph's Distributing Co. v. AMF, Inc.*, 667 F.2d 670, 673 n.6 (8th Cir. 1981) (applying Iowa law).

Examining the Agreement in this case under the predominant purpose test, the Court agrees with SICK that the Agreement is primarily for the sale of goods. For example, the Agreement explicitly provides that the "relationship between SICK and

[MCC] shall be that of vendor and purchaser." (Agreement § 3.) The Agreement also provides that MCC's responsibilities to SICK include to "[s]ell SICK sensor products" and to "[m]aintain local inventory." (Agreement § 6.) Furthermore, no party has submitted evidence that SICK paid additional compensation to MCC for any of the incidental services it provided under the Agreement. *See AKA Distributing*, 137 F.3d at 1085 (suggesting that such payments may indicate a contract for services).

The Court concludes that the predominant purpose of the Agreement between SICK and MCC was the sale of SICK products, and that the Agreement is governed by Article 2 of the U.C.C. Accordingly, because MCC suffered only economic loss under the Agreement, MCC is limited to contractual remedies, and its tort claims are therefore barred under Minnesota's economic loss doctrine.

### F. Promissory Estoppel

Finally, SICK argues that MCC's promissory estoppel claim is barred because the doctrine does not apply in this case. Promissory estoppel "is an equitable remedy [that] implies a contract in law where none exists in fact." *Waldor Pump & Equipment Co. v. Envirex, Inc.*, Civ. No. 92-702, 1993 U.S. Dist. LEXIS 13315 at *37 (D. Minn. May 12, 1993). *See Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981). The doctrine does not apply where a contract actually exists, for in such a case "there is nothing for equity to imply." *Waldor Pump*, 1993 U.S. Dist. LEXIS 13315 at *38. In this case there is clearly a contract in fact – the Agreement. MCC argues that promissory

estoppel should apply because when it filed its counterclaims, MCC disputed whether the Agreement was still in effect. This is beside the point. Even if MCC disputed whether the Agreement continued in effect, it never claimed that there was **no** Agreement. Because a contract in fact plainly exists here, the doctrine of promissory estoppel does not apply. MCC's claims under that doctrine are therefore barred.

For the foregoing reasons, the Court granted SICK's motion for summary judgment on all of MCC's counterclaims on March 31, 2003. Having disposed of the counterclaims against SICK, the Court now turns to the principal action by SICK against CIC and MCC.

## III. CIC's Motion for Summary Judgment / To Dismiss

SICK alleges four claims against CIC: (1) breach of contract; (2) breach of fiduciary duty; (3) deceptive trade practices; and (4) civil conspiracy. CIC seeks to dismiss the first two counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and seeks summary judgment on the second two counts. CIC also contends that all four claims are barred by collateral estoppel.

### A. Collateral Estoppel

CIC argues that all of SICK's claims are barred because the issues they raise were considered and determined by Arbitrator Solum's Decision and Award. Under Minnesota's doctrine of collateral estoppel, the arbitrator's decision will bind this Court if: (1) the issues before the Court are identical to those in the arbitration; (2) there was

final judgment on the merits; (3) the estopped party, SICK, was a party to the arbitration; and (4) SICK was given a full and fair opportunity to be heard on the adjudicated issue. *Minneapolis Community Development Agency v. Buchanan*, 268 F.3d 562, 566 (8th Cir. 2001); *American Federation of Television & Radio Artists Health & Retirement Funds*, 934 F.2d at 991; *Ossman v. Diana Corp.*, 825 F. Supp. 870, 874-75 (D. Minn. 1993).

The Court finds that collateral estoppel does not bar SICK's claims, because the issues in the suit between SICK and CIC are not identical to those in the arbitration. Both SICK and CIC rely upon Arbitrator Solum's opinions to support their positions. The Court finds that although Solum's written opinions show that issues related to CIC may have been "submitted" to him, they were not part of his decision.

Arbitrator Solum addressed CIC twice: once in his initial Decision and Award, and once in his denial of MCC's request for modification. In his first discussion of the CIC issues, Solum stated:

> There was evidence that MCC was competing with SICK through CIC. While the undersigned did not need to reach this question for reasons set out above, it appeared that sales of competitive products through a company so aligned to and controlled by MCC as was CIC . . . could be either a direct violation of the Agreement, or a violation of the covenant of fair dealing by MCC.

(Solum I at 12 n. 14.) MCC later requested that Solum remove this passage. He responded:

> As to CIC, MCC urges the undersigned to omit footnote 14 or to revise the award to find that the MCC activities relative to CIC competitive sales were not a breach. MCC claims that CIC issues were not submitted. But of course the issues were submitted by SICK in an

> effort to prove another breach by MCC, contending that the competitive sales of CIC were or should be attributable to MCC. **The undersigned did not need to reach this issue** (about which there were materiality questions), **as such a finding of no breach or breach would not have altered the Decision and Award**. . . . [T]he undersigned provided footnote 14 so that the parties may have some guidance in respect to future MCC/CIC activities. **The footnote is in this respect dicta**, and the undersigned so acknowledges.

(Solum II at 3-4) (emphasis added).

CIC argues that because the issues regarding it were submitted to Solum, they were decided, and therefore collateral estoppel bars SICK's present claims. It is evident from the passages above that although the CIC questions were submitted, Solum declined to resolve them. Solum further stated that resolution of these issues would not have altered his decision. Thus, the issues upon which the arbitration turned were clearly not those involving CIC, and are therefore different than the issues in this case. Because the issues in the arbitration are not identical to those in this case, the Court finds that collateral estoppel does not bar SICK's claims against CIC.[5]

[5] SICK also argues that collateral estoppel does not apply because the CIC issues considered at arbitration were not necessary to the decision. This argument relies upon the Eighth Circuit's criteria for collateral estoppel, which differ slightly from the Minnesota rules that the Court must apply in this diversity case. *See Ossman v. Diana Corp.*, 825 F. Supp. 870, 874-75 (D. Minn. 1993) (noting differences between the Eighth Circuit and Minnesota tests). Nevertheless, Minnesota law recognizes that collateral estoppel does not apply to issues "incidentally or collaterally decided" in prior proceedings. *Harbal v. Federal Land Bank of St. Paul*, 449 N.W.2d 442, 448-49 (Minn. Ct. App. 1990) (quoting *Anderson v. Mikel Drilling Co.*, 102 N.W.2d 293, 297 (Minn. 1960)). Arbitrator Solum makes clear that the CIC issues were not necessary to his decision, and indeed were mere dicta. (Solum II at 3-4.) Therefore, the Court also finds that collateral estoppel does not apply here because the CIC issues were merely incidental to the arbitrator's decision.

### B. Motion to Dismiss under Rule 12(b)(6)

The Court has performed a further review of the arguments and the record, and now reconsiders its previous denial of CIC's motion to dismiss.

#### 1. Breach of Contract

The parties agree that CIC is not a party to the Agreement between SICK and MCC. SICK's breach of contract claim relies upon its contention that CIC is an "alter ego" of MCC, and therefore can be held liable for CIC's own actions in breach of the Agreement.[6] CIC seeks to dismiss the breach of contract claim, arguing that SICK has not pleaded any facts upon which it could prevail on its alter ego theory. Upon reconsideration, the Court agrees with CIC, and therefore grants its motion to dismiss.

Minnesota law applies the "alter ego" doctrine – also known as "piercing the corporate veil" – to impose liability on an individual shareholder or company that has used a corporate form to evade liability. *See Victoria Elevator Co. of Mpls. v. Meriden Grain Co., Inc.*, 283 N.W.2d 509, 512 (Minn. 1979). To properly plead a cause of action under this doctrine, a plaintiff must meet two requirements: "(1) analyzing the reality of how the corporation functioned and the defendant's relationship to that operation; and (2) finding injustice or fundamental unfairness." *Minnesota Power v. Armco, Inc.*, 937

[6] SICK also contends that CIC breached an oral agreement. As CIC notes, SICK did not plead such an allegation in its complaint. In any event, SICK presents no evidence of any oral agreement, and the Court finds this allegation to be without any evidentiary support.

F.2d 1363, 1367 (8th Cir. 1991). *See Victoria Elevator*, 283 N.W.2d at 512. To perform the analysis required in the first prong, a plaintiff may rely upon several "significant" factors, including:

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

*Victoria Elevator*, 283 N.W.2d at 512. Disregarding the corporate entity requires that "a number of these factors be present." *Id.*

The Court finds that SICK has not shown any of these factors to be present, much less "a number" of them. SICK's allegations rely exclusively on the interconnectedness of MCC and CIC, showing that the two companies share employees, offices, and equipment. Although these examples may show CIC to be the "alter ego" of MCC as that term is commonly used, SICK's allegations meet none of the requirements for the legal alter ego doctrine. The *Victoria Elevator* factors emphasize that a corporate form is a mere "façade" for the dealings of another entity. *Id.* Although SICK tries to show that MCC and CIC are "operated as virtually the same company," it does not allege or show that CIC's existence is intended to hide MCC or its dealings.

The alter ego doctrine also does not apply because SICK has not properly pleaded that "injustice or fundamental unfairness" exists. *See id.* This requirement is based on the principle that "to allow an individual to escape liability because he does his business

under a corporate form is to allow him an advantage he does not deserve." *Id.* The alter ego doctrine is thus designed to impose liability on the "true" defendant, rather than a corporate form used to avoid liability. In this case, SICK alleges that MCC created CIC as a sham corporation and its alter ego. SICK's allegations fail because it has not shown that MCC used CIC to escape liability. To the contrary, the extensive litigation in this case shows that CIC's existence does nothing to shield MCC from its purported liability to SICK. Thus, even if all of SICK's allegations about the relationship between MCC and CIC are true, SICK has provided no evidence or allegations of the "injustice or fundamental unfairness" requirement.

SICK's principal contention seems to be that MCC created CIC as a means of evading MCC's duties under the Agreement. Although this may bear upon MCC's ultimate liability, it does not make CIC a party to the contract or an "alter ego," in the legal sense, of MCC. For these reasons, the Court now reconsiders its previous ruling, and finds that SICK can prove no set of facts that would entitle it to relief on its breach of contract claim. Therefore, CIC's motion to dismiss SICK's breach of contract claim must be granted.

**2. Breach of Fiduciary Duty**

SICK has withdrawn its claim for breach of fiduciary duty, and presents no argument in opposition to CIC's motion to dismiss the claim. Therefore, the Court will grant CIC's motion to dismiss SICK's breach of fiduciary duty claim.

## C. Motion for Summary Judgment

### 1. Deceptive Trade Practices

CIC seeks summary judgment on SICK's claim under Minnesota's consumer fraud and deceptive trade practices statutes, Minn. Stat. §§ 325D.44 and 325F.69. Specifically, CIC argues that SICK provided insufficient evidence to support its allegations that CIC misrepresented itself as an authorized distributor of SICK products, and that CIC misrepresented non-SICK products as having come from SICK. To make out a claim under the Minnesota Deceptive Trade Practices Act, SICK must demonstrate some likelihood of confusion or misunderstanding. *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1137 (D. Minn. 1981). To withstand summary judgment, SICK need not prove that anyone was actually confused. *CSM Investors, Inc. v. Everest Development, Ltd.*, 840 F. Supp. 1304, 1314 (D. Minn. 1994).

The Court agrees with CIC that SICK has presented no evidence that CIC represented non-SICK products as having come from SICK. The question of CIC's authorization, however, is less clear. Whether CIC was or was not an authorized distributor of SICK products is among the central questions in this case, and both parties have presented conflicting evidence and documentation on that point. Most important for this motion, SICK presents evidence through affidavits and documentary support that CIC held itself out as an authorized distributor of SICK products. (*See* Silton 7/22/02 Aff. Ex. 31, 33; Freedman 7/22/02 Aff.) CIC argues that SICK's evidence is of little

value, and presents further evidence to discredit SICK's submissions. (*See* Quaine 5/2/02 Aff. Ex. 1; Elsass 6/19/02 Aff. Ex. A.) CIC may ultimately prove correct about the value of SICK's evidence. Upon the record as presented, however, the Court finds that SICK has demonstrated a genuine issue of material fact and shown a likelihood of confusion as to whether CIC was an authorized distributor. On this basis, the Court has denied CIC's motion for summary judgment on SICK's consumer fraud and deceptive trade practices claims.

**2. Civil Conspiracy**

CIC also seeks summary judgment on SICK's claim for civil conspiracy. The Court has reconsidered its ruling on this claim, and now grants CIC's motion.

"Under Minnesota law, a conspiracy is a combination of persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Bloom v. Hennepin County*, 783 F. Supp. 418, 446 (D. Minn. 1992). *See Anderson v. Douglas County*, 4 F.3d 574, 578 (8th Cir. 1993); *Senart v. Mobay Chemical Corp.*, 597 F. Supp. 502, 504-05 (D. Minn. 1984); *Harding v. Ohio Casualty Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824 (Minn. 1950). The Minnesota Supreme Court has noted that "[a]ccurately speaking, there is no such thing as a civil action for conspiracy." *Harding*, 41 N.W.2d at 825. "Rather, a civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability." *Bloom*, 783 F. Supp. at 446. Under Minnesota law, "[p]ersons combining to achieve goals that they have a legal right to seek, even if

they are maliciously motivated, do not 'conspire.'" *Senart*, 597 F. Supp. at 505. Thus, courts have held that civil conspiracy must be based upon a criminal act or an underlying intentional tort. *Id.* (citing Prosser, *Handbook on the Law of Torts* § 46); *Harding*, 41 N.W.2d at 825 ("Since the allegations as to conspiracy do not change the nature of the cause of action . . . there can be no recovery unless substantive wrongs are pleaded.").

CIC argues that summary judgment must be granted in this case because SICK has not pleaded any intentional tort underlying its civil conspiracy claim. The Court agrees. SICK's briefs extensively argue that a civil conspiracy claim may be based upon circumstantial evidence. While this may be true, it does not change the fact that SICK does not allege an intentional tort. A liberal reading of SICK's Amended Complaint suggests that SICK may be articulating a theory of tortious interference with contract. SICK's original complaint against CIC did allege such a claim, but the Court dismissed that count for failure to state a claim upon which relief could be granted. *See SICK, Inc. v. Motion Control Corp.*, Civ. No. 01-1496, 2002 WL 832609 (D. Minn. April 30, 2002). Thus, tortious interference with contract cannot serve as the underlying tort for SICK's civil conspiracy claim.

The pleadings also suggest that SICK's claim is based upon breach of contract. Some case law indicates that breach of contract can serve as the basis for a civil conspiracy claim. *See, e.g., Hansen v. Phillips Beverage Co.*, 487 N.W.2d 925 (Minn. Ct. App. 1992) (suggesting that conspiracy to breach contract claim might be valid if a contract existed); *Stevens v. Redwing*, 146 F.3d 538, 544-45 (8th Cir. 1998) (holding that

under Missouri law, association of individuals for the purpose of causing a breach of contract is actionable as conspiracy); *Falstaff Brewing Corp. v. Iowa Fruit & Produce Co.*, 112 F.2d 101, 108 (8th Cir. 1940) (holding that under Iowa law, "conspiracy to cause breach of contract is actionable"). Nevertheless, this Court has already held that SICK's breach of contract claim against CIC must be dismissed, so this avenue is also foreclosed.

SICK presents evidence of concerted action by MCC and CIC, but it is missing the crucial element that converts such action into conspiracy – an underlying wrong. *See Senart*, 597 F. Supp. at 505. For this reason, the Court reconsiders its previous ruling, and finds that SICK has not demonstrated a genuine issue of material fact on its civil conspiracy claim. Therefore, CIC's motion for summary judgment on SICK's civil conspiracy claim must be granted.

## IV. MCC's Motion for Summary Judgment

SICK's amended complaint contains four causes of action against MCC that are relevant to this motion: breach of contract (Count I); breach of fiduciary duty (Count II); unjust enrichment (Count IV);[7] and breach of the covenant of good faith and fair dealing (Count V).[8] MCC contends that all of SICK's claims relating to events prior to October 5, 2001 – the termination date that SICK sought in the Solum arbitration -- are

[7] The amended complaint contains no Count III.

[8] Count VI of the amended seeks declaratory judgment regarding termination of the Agreement. SICK has stipulated that this claim is barred under the doctrine of *res judicata*. Accordingly, the Court will dismiss Count VI.

barred by collateral estoppel because they were determined by Solum. MCC also argues that all claims for events happening after October 5, 2001 are governed by the Agreement's arbitration clause and cannot be litigated in court before they are arbitrated.

As discussed above, under Minnesota's doctrine of collateral estoppel, the arbitrator's decision will bind this Court if: (1) the issues before the Court are identical to those in the arbitration; (2) there was final judgment on the merits; (3) SICK was a party to the arbitration; and (4) SICK was given a full and fair opportunity to be heard on the adjudicated issue. *Buchanan*, 268 F.3d at 566; *American Federation of Television & Radio Artists Health & Retirement Funds*, 934 F.2d at 991; *Ossman*, 825 F. Supp. at 874-75. Collateral estoppel will only bar issues that were "necessary and essential" to result in judgment. *Diocese of Winona v. Interstate Fire & Casualty Co.*, 841 F. Supp. 894, 897 (D. Minn. 1992) (quoting *Ellis v. Minneapolis Comm. on Civil Rights*, 319 N.W.2d 702, 704 (Minn. 1982)). Issues that were "incidentally or collaterally decided" are not barred by collateral estoppel. *Harbal v. Federal Land Bank of St. Paul*, 449 N.W.2d 442, 448-49 (Minn. Ct. App. 1990) (quoting *Anderson v. Mikel Drilling Co.*, 102 N.W.2d 293, 297 (Minn. 1960)).

SICK's complaint makes two principal contentions: (1) MCC breached the Agreement by directly selling competitive products from the Dolan-Jenner company (Counts I and IV); and (2) MCC breached the Agreement by selling competitive products indirectly through CIC (Counts II and IV). SICK argues that collateral estoppel does not bar these claims because the issues were not essential to Solum's decision, and because

they are not identical to the questions considered at arbitration. A review of Arbitrator Solum's opinions shows that the arbitration dealt primarily with a different issue – SICK's direct sales activity in Michigan, and how it affected MCC's breaches of the Agreement and SICK's right to terminate. However, Solum did address, at least marginally, MCC's sale of Dolan-Jenner products directly (*see* Solum I at 7) and through CIC (*see* Solum I at 11 n.14; Solum II at 3-4).

**A. Before October 5, 2001**

This Court has already determined in its analysis of CIC's motion for summary judgment that Solum discussed issues relating to CIC, but that they were not necessary or essential to his decision. *See supra* Part III.A. Therefore, for this motion the Court need only decide whether and to what extent Solum decided the issue of MCC's **direct** sales of Dolan-Jenner products.

The Court finds that SICK correctly reads Arbitrator Solum's language. Solum concluded that although MCC's direct sales of Dolan-Jenner products may have somewhat impaired SICK's contractual rights, both parties understood that a transition period would be necessary during which MCC would sell significant numbers of competitive products. (*See* Solum I at 7.) Solum found that such sales tapered off after mid-1999, and concluded that he "could not find either that MCC's dated sales of competitive product was either (1) a true reason for SICK's desire to terminate [in October 2001], or (2) a substantial breach of the Agreement during the 2000 to 2001

distributorship year." (*Id.*) In concluding that that MCC's sales were neither a "true reason" nor a "substantial breach," Solum acknowledged two possible explanations for SICK's desire to terminate as of October 5, 2001, but found that they were not present. This passage demonstrates that Solum considered MCC's sales of competitive products only to the extent that they supplied a reason for SICK's desire to terminate the Agreement at the end of the 2000-2001 Agreement year. Accordingly, he did not decide whether MCC's earlier sales of Dolan-Jenner products constituted a breach of contract. Even if Solum's decision can be construed as making such a determination, it was not necessary to his ultimate Decision and Award.

Examining the arbitration Award also shows that Solum did not consider any pre-2000 breaches by MCC through sales of Dolan-Jenner products. The Award and Decision contains a section entitled "Compliance With and/or Breaches of the Agreement," which details all the relevant breaches of the Agreement and specifically lists two breaches by MCC: failure to provide point-of-sale reports, and failure to employ the required number of salespersons. (*Id.* at 9.) The section also describes breaches by SICK. (*Id.* at 10.) The Decision and Award did not include a finding that the competitive sales were part of SICK's reason to terminate. The Award essentially imposes a compromise on the parties, and is premised largely upon the established breaches by SICK and MCC. Thus, the Court concludes that although Solum discussed MCC's pre-2000 sales of competing products in violation of the Agreement, this discussion was not necessary or essential to Solum's ultimate Decision and Award.

Accordingly, the Court finds that SICK's claims for events preceding October 5, 2001 are not barred by collateral estoppel, and MCC's motion for summary judgment in this regard was denied.

**B. After October 5, 2001**

On January 30, 2002, SICK served notice of its intent to terminate the Agreement as of October 5, 2002. After Solum issued his decision on April 1, 2002, SICK again gave MCC notice of its intent to terminate the Agreement in October 2002. SICK noted several defaults by MCC, including: (1) failure to provide point of sale reports; (2) sale and distribution of SICK products through CIC; and (3) failure to maintain at least 15 "outside" salespeople selling SICK products. MCC responded, claiming that it had cured these defaults, and demanding another round of arbitration pursuant to Section 13 of Agreement. Following unsuccessful settlement negotiations, SICK moved to compel arbitration before Arbitrator Solum. On June 24, 2002, United States Magistrate Judge Franklin L. Noel granted SICK's motion to compel arbitration, but denied the specific request to arbitrate before Solum. The parties could not agree on an arbitrator, and MCC submitted the matter to the American Arbitration Association, where it is apparently still pending.

MCC argues that all the claims in SICK's amended complaint that relate to events occurring after October 5, 2001 may not proceed because they must be arbitrated in this latest round of arbitration. Specifically, MCC argues that Section 13 of the Agreement,

which provides MCC's exclusive remedy for SICK's efforts to terminate, also makes arbitration the exclusive forum for SICK to litigate its damage claims. Section 13 provides in relevant part:

> In the event SICK intends to terminate the Agreement based on the allegation of inadequate performance by [MCC], [MCC] may, as its sole and exclusive remedy and if acting in good faith, it shall immediately submit the issue in question to informal binding arbitration at Minneapolis, Minnesota.

(Agreement § 13.)

SICK contends that Section 13's exclusive remedy provision applies only to MCC, and does not govern SICK's claims for damages resulting from MCC's breaches of the Agreement. The Court agrees. Although the parties argue over the meaning of this small portion of Section 13, a reading of the complete section demonstrates that it is concerned primarily – as its title suggests – with the mechanics of termination. In some instances, these mechanics are intimately bound up with questions of adequate performance. For example, Section 13 provides that SICK may not terminate the agreement unless MCC fails to meet certain obligations, including "compl[ying] with the terms and conditions of this Agreement." (*Id.*) Section 13 also provides that if either party fails to perform any obligation under the Agreement, the non-defaulting party may terminate the Agreement upon 30 days notice. Although these provisions cite lack of performance as a **ground for termination** of the contract, no party has submitted evidence that the Agreement explicitly prevents SICK from also seeking damages for breach of the Agreement.

The Court finds that the "issue in question" in an arbitration under Section 13 is whether any alleged inadequate performance justifies SICK's effort to terminate. MCC is correct that SICK cannot avoid arbitrating this question. Nowhere, however, does the Agreement state that SICK may not, in addition to terminating the Agreement, seek damages. MCC's argument would be correct if Section 13 required SICK to submit all grievances under the Agreement to arbitration. But Section 13 does not do so. It merely permits MCC to arbitrate the question of SICK's right to terminate the Agreement, not SICK's right to obtain any relief for breach.[9] The Court therefore finds that Section 13 of the Agreement does not bar SICK's claims for damages in the present case, and the Court has denied MCC's motion for summary judgment in this regard.

The Court observes that its resolution of these complicated issues is likely to leave all parties somewhat unsatisfied. This is not unusual in civil litigation. But given the protracted history of this litigation and the great expense in time and funds spent by all parties, the Court questions whether it is in the interest of any party to continue down the road to trial. Therefore, without expressing any opinion on how the remaining issues in

[9] This analysis may seem inconsistent with the Court's rejection of MCC's arguments opposing SICK's motion for summary judgment on the counterclaims. On that motion, the Court determined that the Solum arbitration was not limited to the simple question of whether or not the Agreement was terminated, but encompassed all issues related to the termination, including relief for the parties. There is a key distinction. That decision was in the context of an arbitration that had already occurred, and in which the parties had agreed upon a wide scope of issues to be decided and broad authority for the arbitrator. Thus, in that instance the Court analyzed issues that the parties had **allowed** to be arbitrated, which exceeded the narrow constraints of Section 13. In this instance, the prospective third arbitration has yet to occur, so the Court's analysis is confined to what is **required** to be arbitrated by Section 13.

this case would be resolved in a trial, the Court urges the parties to make further efforts to resolve their differences without resorting to additional litigation.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Item Number 2 of the Court's Order dated March 31, 2003 [Docket No. 144] denying defendant Commerce Industrial Corporation's Motion for Summary Judgment and to Dismiss [Docket No. 95] is **VACATED**.

2. Defendant Commerce Industrial Corporation's ("CIC") Motion for Summary Judgment and to Dismiss [Docket No. 95] is **GRANTED IN PART and DENIED IN PART** as follows:

    a. CIC's motion to dismiss Count VII of the First Amended Complaint (Breach of Contract) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **GRANTED.**

    b. CIC's motion to dismiss Count VIII of the First Amended Complaint (Breach of Fiduciary Duty) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **GRANTED**.

    c. CIC's motion for summary judgment on Count IX of the First Amended Complaint (Deceptive Trade Practices) is **DENIED**.

d. CIC's motion for summary judgment on Count X of the First Amended Complaint (Civil Conspiracy) is **GRANTED**.

**IT IS FURTHER ORDERED** that:

3. Count VI of the First Amended Complaint (Declaratory Judgment against defendant Motion Control Corp.) is **DISMISSED WITH PREJUDICE**.

DATED: June 19, 2003
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge