**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Court File No. 01-CV-1496 JRT/FLN

SICK, Inc.,
a Minnesota corporation,

Plaintiff,

v.

Motion Control Corporation and
Commerce Industrial Controls, Inc.,

Defendants.

**MOTION CONTROL CORPORATION'S MEMORANDUM IN OPPOSITION TO SICK, INC.'S MOTION TO RENEW MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

## INTRODUCTION

SICK, Inc., as defendant on Motion Control Corporation's new counterclaims, has brought a motion seeking to "renew" the motion to dismiss that it served on October 1, 2003. SICK contends that its motion should be granted primarily because, at a hearing on March 5, 2004, the Court "acknowledge[ed] that SICK was likely entitled to the relief sought on its Motion to Dismiss." (SICK's May 20, 2004 Mem. at 2.) SICK relies heavily on a transcript of the Court's comments at the March 5 hearing. Now that Hennepin County District Court has issued an order denying MCC's motion to vacate the Solum Arbitration Award of April 1, 2002, according to SICK's reasoning, it is a perfunctory matter for this Court to grant SICK's Rule 12 motion.

One of the main problems with SICK's renewed motion, however, is that any dismissal of any part of MCC's claims cannot properly be determined through a Rule 12 motion. In discussing the prospect of narrowing some claims or issues prior to trial, the Court noted:

> there may well be a need for a summary judgment motion. I'm not sure, but that's probably a place where we will narrow the claims down before a trial unless the parties decide to resolve the matter themselves.

(Transcript of March 5, 2004, Hearing at 58.) If some of SICK's arguments for dismissal of the new claims are to be considered, that must be done on a motion for summary judgment under Rule 56. SICK has submitted and is asking the Court to rely on many documents outside the pleadings as a basis for its motion to dismiss. Since the Court has accepted those materials, it is obligated to convert the motion into one for summary judgment and give the parties notice of their opportunity to submit all relevant evidence. See Fed. R. Civ. P. 12(b)(6). Moreover, MCC

is submitting some additional documents with this opposition, to establish the merit of its new claims. Even if notice had been given, these documents, when viewed in the light most favorable to MCC, raise genuine fact issues requiring determination at trial. SICK's renewed Rule 12 motion is procedurally improper and must also be denied on substantive grounds.

MCC's claims in this lawsuit involve conduct that occurred after October 5, 2001. As detailed in MCC's original opposition memorandum, any remedy for breach of the Distributorship Agreement occurring after October 5, 2001 was not heard, considered or evaluated by arbitrator Solum. Indeed, although Solum ruled in his April 2002 Award that the distribution relationship would terminate on March 31, 2004, he explicitly indicated that "the terms of the Agreement except as provided and as interpreted in" his decision remained binding "[d]uring the remainder of the distributorship." (Complaint, Exhibit 2 at 12). Therefore, SICK's contention that its motion to dismiss is ripe now that Judge Steenson DuFresne has denied MCC's motion to vacate the arbitration award is wrong. Further, contrary to SICK's assertions, the Award did not immunize it for its conduct after October 5, 2001. The record, as detailed below, demonstrates that SICK engaged in direct selling and pricing activities in violation of the terms of the 1998 Distributor Agreement ("Agreement") and the Agreement as interpreted by Solum <u>after</u> October 5, 2001. The claims alleged by MCC in the now-consolidated "03" matter cannot, therefore be resolved via a Rule 12 motion. SICK's renewed motion to dismiss must be denied and the competing claims should proceed to a trial.

# FACTUAL BACKGROUND[1]

## I. The Procedural Posture.

This Court denied SICK's previous Motion to Dismiss and consolidated this action with the '03 Action on March 5, 2004. On May 6, 2004, Judge Steenson DuFresne issued an Order denying MCC's Motion to Vacate the Solum Arbitration Award in the state court arbitration action. MCC served and filed its Notice of Appeal of the order and judgment denying its Application to Vacate the Award on July 13, 2004. (Affidavit of Geraint D. Powell, Exhibits 1 & 2). Since these actions were consolidated, the parties have conducted limited discovery, consisting of the supplementation of answers to interrogatories and responses to document requests.

## II. MCC's Claims in the '03 Complaint.

In the '03 Complaint, MCC alleges that SICK breached the express terms of the Agreement and the terms of the Agreement as interpreted by Arbitrator Solum after October 5, 2001. (Complaint at ¶ 18).[2] MCC alleges that SICK violated the Agreement after October 5,

---

[1]MCC incorporates by reference the factual recitation contained in its Memorandum in Opposition to SICK's previous Rule 12 motion in the '03 case, which details the factual circumstances of the parties' contractual relationship and the previous arbitrations.

[2]In his decision, Arbitrator Solum expressly determined that the terms of the Agreement, as interpreted in his decision, continued to be binding on the parties and that SICK was "to support and assist MCC in the territory" and "to honor MCC's rights of exclusivity as provided in the agreement and this decision and award" up to the date of the Agreement's termination as determined by Arbitrator Solum. (Complaint at ¶ 14). Arbitrator Solum also found that the Agreement precluded SICK from "direct selling activities (including pricing activities) which would materially hinder MCC's ability to realize both parties' (as understood by those who actually negotiated the Agreement) intended expectations relative to MCC's distributorship in Michigan." (Complaint at ¶ 14).

2001 by, among other things, making direct sales to customers in Michigan that materially hindered MCC's ability to realize its intended expectations relative to its exclusive distributorship in Michigan, by failing and refusing to assist MCC in the sale of SICK products, by allowing other distributors and companies to make sales in Michigan and by undermining MCC's customer relationships and goodwill. (Complaint at ¶ 18). MCC additionally alleges that SICK's actions in breach of the terms of the Agreement are a *de facto* termination of the Agreement without cause. (Complaint at ¶ 19).

MCC also alleges in the Complaint that SICK violated the covenant of good faith and fair dealing, which is implied in the Agreement under Minnesota law. (Complaint at ¶ 20). MCC maintains that SICK violated the implied covenant of good faith and fair dealing by unjustifiably hindering and frustrating MCC's ability to perform its obligations under the terms of the Agreement by, among other things, making direct sales to customers in the territory in violation of the Agreement, by selling products to other companies and entities to distribute in the territory, by undercutting MCC's pricing efforts with customers in the territory, and by failing to support MCC's efforts to market and distribute SICK products in the territory. (Complaint at ¶ 20).

As a result of SICK's conduct after October 5, 2001, MCC suffered damages due to its significant investment of money, time and resources in training and compensating its personnel and in promoting SICK's product lines and business in Michigan. (Complaint at ¶ 21). MCC alternatively alleges that it has suffered damages in the form of lost profits on sales that were wrongfully made by SICK in breach of the terms of the Agreement. (Complaint at ¶ 21).

**III. SICK's Actions After October 5, 2001.**

The allegations of MCC's Complaint are supported by the facts that have been revealed in discovery. Documentation produced by SICK demonstrates that SICK engaged in significant direct selling and pricing activities to customers in Michigan after October 5, 2001. (Affidavit of Russell R. Quaine, Exhibits 1 & 2; Powell Affidavit, Exhibit 3[3]). From discovery to date, MCC has received documents entitled "Michigan Direct Sales" and a report generated by SICK entitled "MI Pos [purchase orders] Not Through MCC." These documents show purchase orders for sales into Michigan that were not sold through MCC. (Quaine Affidavit, Exhibits 1 & 2). Additionally, SICK has produced direct price quotations and purchase orders from MCC customers in Michigan. (Quaine Affidavit, Exhibit 3; Powell Affidavit, Exhibits 4-8).

Documents produced by SICK reveal that the direct sales made by SICK's personnel in Michigan for 2003 were at least $1.4 million dollars. (Powell Affidavit, Exhibit 3 at SI SUP 01447). For example, SICK issued price quotations to MCC's customer, Benteler Automotive, for direct sales and also sought to dictate the margins at which MCC would be allowed to sell SICK's products. (Powell Affidavit, Exhibit 4 & Exhibit 5 at SI SUP 01148; Quaine Affidavit). SICK also apparently filled purchase orders and issued price quotations to MCC customers ComauPico Powertrain (Powell Affidavit, Exhibit 6), Paslin (Powell Affidavit, Exhibit 7) and Bosch Packaging (Powell Affidavit, Exhibit 8 & Quaine Affidavit). SICK's personnel were also apparently motivated to take business direct so they could do "anything to keep from putting

[3]The documents produced by SICK that are attached to the Affidavit of Geraint D. Powell are subject to confidentiality restrictions pursuant to the Court's Protective Order filed June 6, 2002. MCC, as a result, has not included a comprehensive discussion of the specifics of this documentation in this Memorandum.

more money in MCC." (Powell Affidavit, Exhibit 9 at SI SUP 01207). MCC personnel also obtained information from customers regarding direct selling and pricing activities by SICK in the territory, and MCC has identified these customers and produced documentation to corroborate this information to SICK. (Quaine Affidavit, Exhibits 3-6).

The evidence of SICK's conduct developed so far in discovery demonstrates that SICK engaged in direct selling and pricing activities with MCC's customers in Michigan after October 5, 2001. There clearly is a triable issue as to whether this conduct violates the Agreement's prohibition on direct sales and Solum's Award precluding SICK from selling away that would "materially hinder" the parties' expectations as to MCC's exclusive distributor status. Since the record demonstrates that MCC's allegations are fully supported by the facts, SICK cannot reasonably maintain that it is entitled to dismissal of MCC's Complaint under Rule 12.

## ARGUMENT

### I. SICK'S MOTION IS PROCEDURALLY DEFECTIVE.

There is no sound basis for SICK's renewed request for dismissal under Fed. R. Civ. P. 12(b)(6). The purpose of such a motion is to test the formal sufficiency of the statement of the claim for relief. It is not a procedure for resolving a contest about the facts or the merits of the case. Peck v. Hoff, 660 F.2d 371, 374 (8th Cir. 1981). A Rule 12(b)(6) motion only tests whether the claim has been adequately stated in the complaint. Id. On a motion to dismiss under Rule 12(b)(6), a court must consider only the allegations contained in the complaint and its attachments, although certain matters of public and administrative record can in some cases be taken into account. Meehan v. United Consumers Club Franchising Corp., 312 F.3d 909, 913

(8th Cir. 2002); Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1102 (8th Cir. 2000); see also Malarkey v. Texaco, Inc., 704 F.2d 674 (2d Cir. 1983), citing C. Wright and A. Miller, 5 Federal Practice and Procedure § 1356 (1969). The matters referenced and submitted by SICK are far beyond this narrow exception and, if addressed at all, SICK's arguments must be viewed as summary judgment arguments under Rule 56.

Although its renewed motion to dismiss is exclusively based on Rule 12, SICK's moving papers make numerous references to matters outside the Complaint. If matters outside the pleadings are submitted and not excluded by the court on a Rule 12 motion, the motion can be converted to a motion for summary judgment only if the nonmoving party is given notice that the motion is being converted and is provided an opportunity to submit "material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b); see also Country Club Estates, L.L.C. v. Town of Loma Linda, 213 F.3d 1001, 1005 (8th Cir. 2000); Inland Container Corp. v. Continental Ins. Co., 726 F.2d 400, 401 (8th Cir. 1984). In Country Club Estates, the Eighth Circuit noted that it requires "strict compliance" with the notice procedure if a Rule 12 motion is to be converted to a motion under Rule 56. 213 F.3d at 1005 (citation omitted).

Although its motion requires the Court to consider matters outside the Complaint, SICK seeks dismissal of MCC's claims solely under Rule 12. MCC pointed out this fundamental flaw when SICK brought its initial motion, SICK continues to ignore the basic requirements on Rule 12 motions and has not acknowledged, even on this renewed motion, that, to consider its arguments, the Court must convert the motion to a motion for summary judgment.[4] Since SICK

[4] To demonstrate the validity of its claims, MCC submits some factual support with this Memorandum,

has submitted matters outside the pleadings for the Court's consideration on this motion, its renewed motion to dismiss cannot properly be based on Rule 12. As a result, SICK's motion to dismiss should be denied.

## II. PLAINTIFF'S CLAIMS ARE NOT BARRED BY RES JUDICATA OR COLLATERAL ESTOPPEL.

As the Court is well aware, a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of its claim that would entitle it to relief. Schaller Telephone Co. v. Golden Sky Systems, Inc., 298 F.3d 736, 740 (8th Cir. 2002), reh'g and reh'g en banc denied. The Court must accept as true all of the complaint's factual allegations and view them in a light most favorable to the plaintiff. Id. Motions to dismiss for failure to state a claim are viewed with disfavor. Leimer v. State Mut. Life Assurance Co., 108 F.2d 302, 306 (8th Cir. 1940).

Res judicata, collateral estoppel and election of remedies are all affirmative defenses. Fed. R. Civ. P. 8(c); Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., 984 F.2d 223, 228 n.2 (7th Cir. 1993) (recognizing that election of remedies is generally regarded as an affirmative defense). As the Eighth Circuit has held, a Rule 12(b)(6) motion premised on a defendant's affirmative defenses cannot be granted unless it conclusively appears from the facts as stated in the complaint that the defense bars the case. Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995); Leimer, 108 F.2d at 305. Here, the affirmative defenses that SICK raises cannot

---

as described in the Facts section. If the Court intends to convert this motion to a Rule 56 motion, MCC requests proper notice of the Court's intention and an opportunity to present additional material for full consideration on a motion for summary judgment.

be established at all, as will be explained, but these affirmative defenses certainly cannot be established on the face of the Complaint and through a Rule 12 motion.

### A. The Summary Judgment Orders of This Court Are Not Final Judgments That Can Be Preclusive as to Any Claims Alleged in MCC's Complaint.

The March 31, 2003 and June 19, 2003 Orders of this Court were interlocutory orders, which did not resolve all of the claims in this case and are not final. The Court has never directed that final judgment be entered on MCC's Counterclaims pursuant to Rule 54(b), nor has SICK requested that. SICK's argument that these interlocutory orders can have preclusive effect ignores the element of collateral estoppel that requires a "valid and final judgment." See In re Miera, 926 F.2d 741, 743 (8th Cir. 1991)("the issue must have been determined by a valid and final judgment..."); Lundquist v. Rice Memorial Hosp., 238 F.3d 975, 977 (8th Cir. 2001). Since no final judgment has been entered regarding MCC's Counterclaims, SICK's assertion that the March 31, 2002 and June 19, 2003 Orders have any preclusive effect to MCC's current claims is simply wrong.

Interlocutory orders do not have res judicata/collateral estoppel effect where a court has not entered a final judgment in the action. A final judgment is an absolute prerequisite to application of the collateral estoppel or res judicata doctrines. See In re Miera, 926 F.2d 741, 743 (8th Cir. 1991) ("It is well settled under the collateral estoppel doctrine that four elements must exist to bar relitigation . . . (3) the issue must have been determined by a valid and final judgment . . ."); Lundquist, 238 F.3d at 977 (recognizing that final judgment is a necessity to an

assertion of res judicata).[5] Since the interlocutory orders were not the subject of a final judgment, they cannot be preclusive of the claims in this or any other case. Accordingly, to the extent that SICK purports to assert res judicata/collateral estoppel based on decisions this Court issued in the SICK Action, there can be no res judicata/collateral estoppel effect as a matter of law.[6]

**B. The Order in the State Court Arbitration Vacation Action is Not Preclusive as to MCC's Remaining Claims in This Case.**

SICK's next contends that it is entitled to a Rule 12(b)(6) dismissal based on Arbitrator Solum's Award. However, this Court should reject this argument as well. The order for judgment in the state court matter involving Solum's arbitration decision cannot be preclusive to MCC's claims arising for the first time on or after October 5, 2001.

The law is clear that a judgment in an action for breach of contract does not preclude a party from maintaining an action for a subsequent breach of the same contract that occurred after commencement of the first action. Baker Group, L.C. v. Burlington Northern & Santa Fe Ry. Co., 228 F.3d 883, 886 (8th Cir. 2000), reh'g and reh'g en banc denied. Therefore, when parties

---

[5] When the final judgment is entered by the federal court, the preclusive effect of the judgment in a diversity action is governed by federal res judicata principles. Porn v. Nat'l Grange Mut. Ins. Co., 93 F.3d 31, 33-34 (1st Cir. 1996). Additionally, Minnesota follows the general rules of res judicata and collateral estoppel that are almost universally applicable and require the following: (a) the parties must be identical or in privity; (b) there must be a final judgment on the merits, and (c) involving the same cause of action. Minneapolis Auto Parts Co. v. City of Minneapolis, 739 F.2d 408, 409 (8th Cir. 1984); National Farmers Union Property & Casualty Co. v. Fisher, 284 F.2d 421, 425 (8th Cir. 1960).

[6] In Section IV of its arguments SICK asserts that this Court can simply dismiss the claims in this case, including MCC's claim for lost profit damages, for the same reasons outlined in the Court's March 31 and June 19, 2003, Orders. This makes no sense – those Orders were for summary judgment (based on factual submissions) and, therefore, cannot support a Rule 12 motion.

have entered into a contract to be performed over a period of time and one party has sued for a breach, *res judicata* will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first suit; it will not bar a subsequent suit for any breach that had not occurred when the first suit was brought. Prime Management Co., Inc. v. Steinegger, 904 F.2d 811, 816 (2d Cir. 1990); Klein v. John Hancock Mut. Life Ins. Co., 683 F.2d 358, 360 (11th Cir. 1982) (judgment based on long-term, continuing contract, which is subject to intermittent breach during its term, does "not automatically bar a later suit for a second identical breach").

In this case, MCC's remaining claims state a distinct cause of action or claim which "did not even exist and which could not possibly have been sued upon in the previous [arbitration] case." See Lawlor v. National Screen Service Corp., 349 U.S. 322, 328 (1955). In an analogous situation, the Supreme Court wrote that a prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." Lawlor, 349 U.S. at 328; see also Cellar Door Productions, Inc. of Michigan v. Kay, 897 F.2d 1375, 1378 (6th Cir. 1990) (claim based on alleged violations arising after first case not barred by *res judicata*); Minarik Electric Co. v. Electro Sales Co. Inc., 223 F. Supp.2d 334, 338 (D. Mass. 2002) (change in facts or law precludes claim preclusion); Hauschildt v. Beckingham, 668 N.W.2d 916 (Minn. Ct. App. 2003) (complaint that alleged facts that occurred *after* the prior claim was filed not barred by claim or issue preclusion); Blanchard & Son Co. v. American Realty Co., 79 N.H. 295, 108 A 291, 292 (1919) ("it is familiar law that no recovery can be had upon a cause of action that arises after the suit was brought"). In situations such as this where the two parties from a previous suit have continued contact

following the judgment in that suit, applying *res judicata* would be tantamount to granting one party immunity for future violations. Minarik, 223 F. Supp.2d at 340, citing Lawlor v. National Screen Service Corp., 349 U.S. at 329.

Here, as detailed in the April 1, 2002 Arbitration Award and as recognized by this Court in its June 19, 2003 Order, the claims at issue in the Solum arbitration related specifically to actions taken by the parties during the October 5, 2000 to October 4, 2001 distributorship year. (Complaint, Exhibit 2 at 7 ("In short, the arbitrator could not find either that MCC's dated sales of competitive product was either (1) a true reason for SICK's desire to terminate, or (2) a substantial breach of the Agreement **during the 2000 to 2001 distributorship year."**(emphasis added)); June 19, 2003 Order at 28 (Court File No. 01-1496, Docket No. 146)("This passage demonstrates that Solum considered MCC's sales of competitive products only to the extent that they supplied a reason for SICK's desire to terminate the Agreement at the end of the 2000-2001 Agreement year.")).

Since the arbitration encompassed specific claimed breaches that occurred prior to the end of the 2000-2001 distributorship year, any claims arising from SICK's conduct thereafter were not the subject of the Award.[7] Contrary to SICK's contentions, the Solum Arbitration Award did not adjudicate any claims or issues arising after October 5, 2001 and did not immunize SICK from liability for actions through the date of the termination date imposed in the

[7]Ultimately, since SICK served notice of its intention not to renew the Agreement for the 2001 to 2002 term on July 2, 2001, any claims arising from SICK's actions **after July 2, 2001** were not subject to determination by Arbitrator Solum and were not barred by the April 1, 2002 Arbitration Award. See Baker Group, L.C., 228 F.3d at 886.

Award. Indeed, in the Award, Arbitrator Solum specifically provided that "the terms of the Agreement except as provided and as interpreted in" his decision remained binding "[d]uring the remainder of the distributorship." (Complaint, Exhibit 2 at 12). Arbitrator Solum specifically noted that the parties remained subject to "the covenants of good faith and fair dealing" and that SICK remained obligated "to support and assist MCC in the territory, and to honor MCC's rights of exclusivity as provided in the agreement and this decision and award." (Complaint, Exhibit 2 at 12). There is no support for SICK's contention that the Award effectively permits it to violate the Agreement with impunity after October 5, 2001.[8] In addressing its res judicata/collateral estoppel arguments pursuant to Rule 12(b)(6) motion, SICK also wants to ignore the complicated nature of what it requests. The differences between courts and arbitrators affect the preclusion doctrine. Arbitrators are not judges, and arbitral procedures often wander far from judicial procedures. As the First Circuit recognized in Wolf v. Gruntal & Co., Inc., 45 F.3d 524, 528 (1st Cir. 1995), because arbitral awards are not "judgments" per se, it cannot be presumed that an arbitral tribunal acquired competent authority over the asserted "precluded" claim for res judicata purposes. As the First Circuit explained:

> Unlike federal courts of limited jurisdiction and state courts of general jurisdiction, wherein a litigant, with standing, unilaterally may invoke the appropriate judicial tribunal's jurisdiction based on extrinsic constitutional, statutory, or common law authority,

[8]SICK's reliance on the Fifth Circuit decision in Miller Brewing Co. v. Fort Worth Distributing, Co., 781 F.2d 494 (5th Cir. 1986) is plainly misplaced. In Miller Brewing, the Fifth Circuit applied *res judicata* to dismiss an attempt to arbitrate claims arising from the same "operative facts" that gave rise to a prior lawsuit that had been dismissed for a failure to prosecute. In stark contrast to Miller Brewing, the operative facts alleged in the Complaint in this action are not facts that were raised or litigated in the Solum Arbitration. Indeed, the Complaint explicitly alleges that the factual basis for MCC's claims arise from actions taken by SICK after the distributorship term that was at issue in the Solum Arbitration.

> arbitrable tribunals' authority over particular "claims" is for the most part predetermined by contract; that is, by written agreement of the parties (noting, as basis for limiting res judicata effect of arbitrable awards, that "the authority of an arbitrator to decide a controversy is derived entirely from the consent of the parties).

(internal citations omitted; emphasis in the original). Accordingly, any time a party seeks to invoke *res judicata* or collateral estoppel based on an arbitration, the court must examine the arbitration provision of the parties' agreement as well as the scope of the submission to the arbitrators. Such an inquiry cannot be done under Rule 12(b)(6). SICK has attempted to further confuse the issues before the Court on this motion by asserting that this action "is, in effect, an attempt to enforce the Arbitration Award." (SICK's October 1, 2003, Memorandum at 14). In support of this argument, SICK cites the unpublished decision of the Minnesota Court of Appeals in Bilotta & Associates v. E.D.S. Construction, 1989 WL 41763 (Minn. Ct. App. 1989) and asserts that it is "on point and dispositive of the issues" in this case. (Id. at 15.) Even a superficial reading of Bilotta reveals that SICK's contention that it is dispositive is entirely misguided.

In Bilotta, the court held that a lawsuit was not the proper procedure to enforce an arbitration award that had granted the plaintiff specific performance of repairs in connection with a construction contract. Bilotta, 1989 WL 41763 (Minn. Ct. App. 1989). When defendant failed to perform, Bilotta brought a new lawsuit alleging damages due to the defendant's failure to make the same repairs that were the subject of the prior arbitration. Instead of starting a new lawsuit pursuing a claim arising from facts that had already been arbitrated, the court noted that Bilotta should have sought to compel specific performance pursuant to post-judgment remedies

available under the rules of civil procedure. Id. at *2. (arbitration award enforceable the same as any judgment). In dismissing the lawsuit, the court specifically noted that "Bilotta could have enforced the award without recourse to this lawsuit." Id.

Unlike Bilotta, however, Arbitrator Solum did not issue an award for specific performance. Indeed, in imposing the March 31, 2004 termination date in the Award, Arbitrator Solum specifically contemplated that the parties' subsequent actions might have consequences with respect to the ongoing distribution relationship:

> This is not to say that there may not be grounds for SICK to terminate the Agreement at some earlier time in accordance with the Agreement's terms. Accordingly, MCC's full performance with sales personnel requirements and good faith efforts to agree to sales goals on which it will be measured could be important, as will SICK's activities and good faith with respect to its direct selling, pricing, setting of sales goals and dialogue relative to channel conflicts in the Michigan market.

(Complaint, Exhibit 2 at 12 n.13). The fact that the Arbitration Award was not an award of specific performance is also apparent in Arbitrator Solum's discussion regarding the issue of exclusivity:

> While the undersigned does not pre-judge how these rights may come to be in conflict in the future, suffice it to say that direct selling transactions in amounts materially diminishing expected sales volumes of MCC would be troublesome.

(Complaint, Exhibit 2 at 11 n.12). From his discussion of the parties' ongoing obligations, including SICK's ongoing obligation to respect MCC's exclusivity rights under the Agreement, it is clear that Arbitrator Solum did not purport to preclude either party from seeking legal redress if the other party failed to uphold its obligations under the Agreement. In addition, the

arbitration before Solum only covered the October 2000 – October 2001 contract year. Because the Arbitration Award is not a judgment for specific performance, SICK's attempt to mischaracterize this action as an attempt to "enforce the arbitration award" misses its mark.[9]

SICK's motion also seeks to ignore the evidence of its own "selling transactions in amounts materially diminishing expected sales volumes of MCC" subsequent to October 5, 2001. (Complaint, Exhibit 2 at 11 n.12). The discovery conducted so far regarding MCC's new claims includes evidence that SICK engaged in direct selling and pricing activities in violation of the Agreement and in ways that were specifically prohibited by Arbitrator Solum in his Award. Further, MCC's President, Russell Quaine, has submitted sworn testimony concerning his knowledge of SICK's direct selling and pricing activities that have significantly hindered MCC's ability to realize the expectations that it had as SICK's exclusive distributor in Michigan. (Quaine Affidavit, ¶ 4).

This Court's prior summary judgment orders are not final judgments that can have preclusive effect barring MCC from pursuing the claims alleged in the Complaint. Moreover, SICK is wrong in contending that the Solum Arbitration Award and Judge DuFresne's decision in the state court Arbitration Vacation Judgment preclude MCC from having any legal remedy for actions taken by SICK on or after October 5, 2001. The Complaint in this action alleges that

---

[9]SICK also implies that all orders for specific performance preclude a subsequent action for damages. This is not the law. Whether an order for specific performance precludes, as a matter of *res judicata*, a subsequent action for damages is a complex question and requires a case by case analysis. See generally, Howard J. Alperin, *Decree Allowing or Denying Specific Performance of a Contract Precluding, as a Matter of Res Judicata, Subsequent Action for Money Damages for Breach*, 38 A.L.R. 3d 323 (1971). In this case, however, the Court need not address this issue where it is clear from the Arbitration Award itself that it is not an award for specific performance.

actions taken by SICK on and after October 5, 2001 have violated the terms of the Agreement, including terms of the Agreement as interpreted by Arbitrator Solum. Since facts and issues arising after October 5, 2001 were not submitted to or determined by Arbitrator Solum in Arbitration II, MCC is not barred from proceeding with the breach of contract claims alleged in the Complaint. SICK's motion to dismiss, accordingly, should be denied.

## III. MCC'S CLAIMS IN THIS CASE ARE NOT BARRED FOR THE SAME REASONS THAT ITS COUNTERCLAIMS WERE DISMISSED IN THE SICK ACTION.

SICK asserts that the Court must dismiss MCC's new claims under Rule 12 based on the legal doctrines of election of remedies and the Court's prior summary judgment orders concerning "Indemnification" Agreement's provision. This theory, however, would require the Court to go beyond what is allowed by a Rule 12 motion.

SICK ignores that the Court's prior orders were rendered on a summary judgment motion, which required an analysis of material outside the pleadings. This material cannot appropriately be considered by this Court on this motion under Rule 12. Indeed, it is clear from the June 19, 2003 Order that the Court considered material far beyond the boundaries of a Rule 12 motion in ruling that MCC had elected a remedy to pursue damage claims in the Solum Arbitration. (Docket no. 146 at 6-10). Similarly, the ruling on the consequential damage limitation provision also suggests that the Court considered material outside the pleadings and the plain language of the Agreement. (Docket no. 146 at 11-12). In the June 19, 2003 Order, the Court did not make a finding that the language of the consequential damage limitation was unambiguous, but instead the Court stated that "the context of the Agreement" was its basis for

finding that MCC's lost profit damages were barred. By considering "the context", the court plainly considered submissions outside the scope of a Rule 12 motion. As a result, SICK's motion seeking to dismiss the new complaint's allegation for lost profit damages at this stage must be denied.

Moreover, it is apparent from the Agreement itself that the consequential damage and lost profit damage limitation language is not free from ambiguity. The language is contained in the section of the Agreement entitled "Indemnification," and it cannot be denied that the balance of Section 15 of the Agreement addresses only the parties' respective obligations if either of them is subject to a claim by a third party. Although the Court indicated in the June 19, 2003 Order that the indemnification for claims made by a third party "could not result in either SICK or MCC being liable to each other for lost profits," this statement did not appear to consider that a third party might recover lost profit damages from either SICK or MCC.[10] This would suggest that the consequential damage limitation would prevent the third party's lost profits from being part of the indemnity obligation between SICK and MCC.

Additionally, a determination that the Agreement precludes MCC from recovering lost profit damages is contrary to basic rules of contract construction, which the parties' intention is

---

[10] MCC contends that the Court was mistaken in its June 19, 2003, Order to the extent it interpreted the parties' Agreement to bar any claims by MCC for lost profit damages. As indicated by the Affidavit of Russell Quaine, submitted in opposition to SICK's renewed motion, the parties did not intend that the "Indemnification" clause of their Agreement would bar them from suing one another for damages caused by breach of the exclusive Distributorship Agreement. But so long as that is the law of the case, MCC will likely bring a motion for partial summary judgment or a motion in limine to preclude SICK from continuing to pursue any claims for consequential damages, including lost profits.

to be construed from the entire contract and not from dissecting specific clauses that are removed from their context. Ploog v. Ogilvie, 309 N.W.2d 49 (Minn. 1981); Republic Nat' Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d 349 (Minn. 1979). Moreover, contracts are not to be construed to create an absurd result that would be contrary to the obvious intent of the parties entering into a contract. Wurdemann. v. Hjelm, 102 N.W.2d 811 (Minn. 1960). In connection with this motion, it is also clear from the affidavits of Russ Quaine and Paul Karty, the MCC representatives who negotiated the Agreement, that the parties to the Agreement did not intend to preclude the recovery of lost profit or other consequential damages. (See Quaine and Karty Affidavits, submitted with this Memorandum.) These persons, with direct knowledge and participation in the negotiations with SICK, have filed Affidavits with this Court that this language was to "prevent either party from seeking lost profits from the other party to the Agreement as a result of a legal claim by a third party" and that the parties intent was that "all available damages, including the lost profits on sales" would be recoverable "if SICK breached the Agreement by directly or indirectly selling to customers in Michigan and engaged in price setting and competition with MCC." Quaine Affidavit, ¶ 12). This evidence creates a fact dispute concerning the interpretation of the contract that cannot be decided as part of a Rule 12 motion.

Ultimately, if this Court does rule that the Agreement unambiguously provides that neither party to the Agreement can recover lost profit damages if the other breaches the Agreement, the Court must additionally conclude that two parties to a commercial transaction, in fact, intended to create a contract that would not allow either party to be made whole upon the

other's breach. Such a construction effectively renders the mutual obligations under the Agreement meaningless because neither party would have any ability to recover the actual damages flowing from a breach by the other party. This conclusion is contrary to canons of contract interpretation. Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 526 (Minn.1990) (courts presume contract language has effect and avoid interpretations rendering provisions meaningless). This conclusion is also contrary to the intention of the parties evidenced by the record before this Court. (Quaine Affidavit, ¶ 12; Karty Affidavit). If the Court is to reach such a conclusion, it plainly cannot do so on a motion brought pursuant to Rule 12.

In any event, SICK's contention concerning the application of this Court's prior ruling on the consequential damage provision to the allegations in this case misrepresents the allegations in this case. MCC's allegations are that it suffered direct reliance damages due to its investment of money, time and resources in training and compensating its personnel and in promoting SICK's product lines and business in Michigan. These allegations go to MCC's performance under the contract and, due to SICK's breach, are recoverable. They are not "consequential" in that they arise directly from MCC's performance. See Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 40 N.W.2d 73 (1949)(seminal case on difference between direct and consequential damages). Accordingly, even if the damages in the form of "lost profits" that may be incurred by either party is limited by the Agreement, MCC's claims for direct reliance damages would be entitled to proceed. SICK's motion to dismiss on these grounds, as a result, should be denied.

## IV. SICK'S REQUEST FOR RULE 11 SANCTIONS SHOULD BE DENIED.

Although it is unclear from its "Renewed Motion" pleading, it appears that SICK is also renewing its motion for Rule 11 sanctions based on MCC pleading the claims that are alleged in the '03 Complaint and that have already survived one Rule 12 motion. In any event, there is no basis for such a request and it should be summarily denied. The standard to be applied is an "objective standard of reasonableness to determine whether or not a Rule 11 violation has occurred." Robinson Rubber Products Co. v. Hennepin County, Minnesota, 12 F. Supp. 2d 975, 981 (D. Minn. 1998) (citing Business Guides, Inc. v. Chromatic Communications Enters., Inc., 498 U.S. 533, 548 (1991)). Courts are to cautiously approach the imposition of sanctions. O'Connell v. Champion Int'l Corp., 812 F.2d 393, 395 (8th Cir. 1987). And Rule 11 sanctions should not be assessed to "'chill an attorney's enthusiasm or creativity in pursuing factual or legal theories[.]'" Robinson, 12 F. Supp. 2d at 981 (quoting LaSalle National Bank of Chicago v. County of DuPage, 10 F.3d 1333 (7th Cir. 1993)[quoting Brubaker v. City of Richmond, 943 F.2d 1363, 1378 (4th Cir. 1991)]). Generally, courts should be particularly hesitant in imposing Rule 11 sanctions when a case is dismissed at the pleading stage of the litigation under Rule 12. Tahfs v. Proctor, 316 F.3d 584, 595-96 (6th Cir. 2003).

Here, SICK cannot demonstrate that Rule 11 sanctions are warranted. The allegations of the Complaint were narrowly drawn to explicitly limit the claims to actions taken by SICK on or after October 5, 200. The Arbitration Award and this Court acknowledge that the Solum Arbitration only addressed claims and issues occurring in the 2000 to 2001 distributorship year. Since SICK's motion to dismiss relies on the erroneous premise that the Solum Arbitration Award, the Arbitration Vacation Judgment and even the interlocutory orders in the SICK Action

essentially immunized it for any and all actions relating to its distribution relationship with MCC until the end of time, SICK's motion to dismiss and this related request for Rule 11 sanctions should be denied. It cannot be that claims survive an initial Rule 12 motion and yet still be considered the basis for Rule 11 sanctions. If SICK has not, in fact, withdrawn or, at least, "not renewed" its Rule 11 motion, it should have. The motion must be denied.

## CONCLUSION

Defendant SICK, Inc. cannot establish that it is entitled to dismissal of the claims alleged in the Complaint under Rule 12. Its arguments ignore the most fundamental requirements of *res judicata* and collateral estoppel, as well as the constraints of any motion brought under Rule 12. SICK's motion to dismiss should be denied, as well as SICK's request for sanctions under Rule 11.

Dated: July 28, 2004

Respectfully submitted,

LOMMEN, NELSON, COLE & STAGEBERG, P.A.

s/ Geraint D. Powell
Barry A. O'Neil, I.D. No. 220875
Kay Nord Hunt, I.D. No. 138289
Geraint D. Powell, I.D. No. 250594
Attorneys for Motion Control Corporation
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 339-8131
FAX (612) 339-8064

Doc. #: 233402