**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Court File No. 01-CV-1496 JRT/FLN

SICK, Inc.,
a Minnesota corporation,

Plaintiff,

v.

**AFFIDAVIT OF RUSSELL R. QUAINE**

Motion Control Corporation and
Commerce Industrial Controls, Inc.,

Defendants.

**RUSSELL R. QUAINE**, being duly sworn upon oath, deposes and states as follows:

1. I am the President of Motion Control Corporation, Inc. ("MCC"). If called as a witness, I can competently testify to the facts contained in this Affidavit.

2. MCC has been in business for 31 years as a distributor of industrial controls and sensor products in Michigan. Over the last 31 years, MCC has developed important and valuable long-term relationships with numerous customers in Michigan.

3. As a result of the 1998 Distributor Agreement (the "Agreement") that is the subject of this action, SICK, Inc. ("SICK") appointed MCC "as its exclusive Master Distributor for sales" in Michigan. Due to its status as the exclusive Master Distributor for SICK sales in Michigan, MCC understood that it had protection against competition from SICK in pursuing direct sales of SICK products in Michigan. MCC also understood that SICK would not quote pricing to Michigan customers, that it would not undercut MCC's prices, and that it would not allow other distributors, competitors or companies to sell SICK products in Michigan. MCC expectations regarding its protection from direct and indirect selling and pricing activities by SICK came from the specific terms of the Agreement, MCC's knowledge of and experience with the industry, and the parties' negotiations regarding the Agreement, including the fact that the

negotiations broke off at one point because MCC demanded exclusivity and SICK relented on this issue the next day. Among other requirements, the Agreement required that SICK "support and assist" MCC in selling SICK products and made SICK MCC's "business partner" in a joint sales and marketing effort. Despite MCC's expectations that SICK would not engage in selling (direct or indirect) or set prices in competition with MCC in Michigan, SICK engaged in significant direct selling in Michigan from 1999 through September 2001, and after that time as well. Attached as **Exhibits 1 and 2** are documents produced by SICK identifying SICK sales and purchase orders in Michigan that were either directly made by SICK or not sold through MCC. Exhibit 1 is entitled "Michigan Direct Sales" and includes sales figures for 1998 through sometime in 2001. Exhibit 2 is a report generated by SICK entitled "MI Pos Not Through MCC," and it shows purchase orders for sales into Michigan from February 1998 through May 29, 2002, that were not sold through MCC.

4. In his April 1, 2002 Arbitration Award ("Award"), arbitrator Richard B. Solum determined that the Agreement prohibited SICK from engaging in competition against MCC. His award states that SICK cannot engage "in direct selling activities (including pricing activities) which would materially hinder MCC's ability to realize both parties' (as understood by those who actually negotiated the Agreement) intended expectations relative to MCC's distributorship in Michigan." I, together with Paul Karty, negotiated the Agreement with SICK on behalf of MCC. Since October 5, 2001, SICK has engaged in direct selling and pricing activities that have significantly hindered MCC's ability to realize the expectations that I had for MCC as SICK's exclusive distributor in Michigan. SICK has continued this type of direct selling and pricing activity to MCC's customers in Michigan since Mr. Solum's Award was issued on April 1, 2002. These actions by SICK have damaged MCC financially and have

damaged MCC's relationships with its customers.

5. In Exhibit 2, SICK's own report identifies a significant number of Michigan purchase orders for SICK products that were not ordered through MCC after October 5, 2001 and April 1, 2002, the date of Mr. Solum's Award. In addition, attached as **Exhibit 7** is a document that looks at MCC's top 25 customers as a whole and those who specifically bought SICK. The document highlights a significant drop in sales of SICK product to Commerce Industrial Controls, Comau Pico, and Siemans. Siemans is even more dramatic in that SICK was the mainstay of our relationship and SICK's improper conversion of the account not only cost MCC its SICK business, but it created a barrier from pursuing other opportunities as well.

6. Attached as **Exhibit 3** is a price quotation from SICK to Ford Motor Company, Wayne Assembly Plant dated October 9, 2002. The quotation references RS Electronics as the Commodity Supplier for the plant. Due to the pricing quoted by SICK, MCC needed to obtain special pricing from SICK to be able to supply the products to RS Electronics so RS Electronics could sell the product to Ford at the quoted price. This quote is an example of how SICK has effectively undercut MCC's pricing strategies, margins, and customer relationships in the market.

7. After October 5, 2001, SICK has: (1) sold to other distributors, directly or indirectly, who supplied products within MCC's exclusive territory; (2) engaged in direct pricing strategies with MCC's customers and sold directly to MCC's customers; and (3) met with MCC's customers secretly and quoted prices undercutting the prices MCC has quoted the customer. In many circumstances, SICK refused to provide MCC with copies of their quotes. These actions by SICK, in violation of the Agreement, completely undermined the exclusivity

(and value) of MCC's distributorship and irreparably harmed MCC's relationship and reputation with its customers.

8. After October 5, 2001, MCC received information from a number of sources, including SICK representatives, that SICK was engaging in direct selling and pricing activity to MCC's customers in Michigan. Attached as **Exhibit 4** is a copy of MCC's Third Supplemental Answers to Plaintiff SICK, Inc.'s First and Second Set of Interrogatories. In the third supplemental answer to interrogatory number 16, MCC identified the customers in Michigan for which it had information that SICK was placing direct sales and engaging in price cutting or competition with MCC after October 5, 2001. In the interrogatory answer, MCC also identified situations where SICK allowed other distributors to supply or price SICK products to customers in Michigan after October 5, 2001. Attached as **Exhibits 5 and 6** are emails from MCC sales personnel to me advising of specific customer accounts in which SICK was engaging in direct selling activity. These two emails are examples of a number of emails generated by MCC's sales personnel after October 5, 2001.

9. Before SICK began engaging in direct selling and price undercutting with MCC in Michigan, MCC had a strong relationship with Paslin, which is located Warren, Michigan. From January 1999 to December 2001, total sales with Paslin equaled $274,482.00. From January 2002 through December 2003, total sales with Paslin declined to $105,248.00.

10. During the 2001 calendar year, Motion Control Corporation's sales of SICK products to Comau Pico significantly declined from the previous year. The reason for this decline in sales was a direct result of SICK's pricing practices which undercut Motion Control Corporation's ability to compete. SICK transitioned Motion Control Corporation's sales and made Comau Pico a direct account. This action was specifically designed to reduce revenue

Motion Control Corporation had previously derived from the Comau Pico relationship.

11. When MCC entered into the 1998 Distributor Agreement with SICK, I did not intend to enter into a contract that would prevent MCC from recovering the benefit of its bargain if SICK failed to uphold its contractual obligations. Although I understood that the indemnification provision of the Agreement contained language that might limit the parties from recovering consequential damages including lost profits, my intent in agreeing to this language was to prevent either party from seeking lost profits from the other party to the Agreement as a result of a legal claim by a third party. My understanding and expectation when MCC entered into the Agreement was that MCC could recover all available damages, including the lost profits on sales, if SICK breached the Agreement by directly or indirectly selling to customers in Michigan and engaged in price setting and competition with MCC. My understanding of the meaning of the consequential damage limitation in the indemnification provision of the Agreement arises from my 30 years experience in negotiating and entering into agreements, including other distributor agreements. There was never any negotiation or discussion between SICK and MCC about an agreement to prohibit either side from recovering "lost profits" damages against the other party. MCC would not have entered into an

agreement that included a provision that was intended to prevent MCC from being made whole if SICK breached the agreement.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

s/ Russell R. Quaine
**RUSSELL R. QUAINE**

Subscribed and sworn to before me
this 28th day of July, 2004

s/ Notary Public
Notary Public

Doc. #: 233347