UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Court File No.01-CV-1496 JRT/FLN

SICK, Inc.,
a Minnesota corporation,

Plaintiff,

v.

Motion Control Corporation and
Commerce Industrial Controls, Inc.,

Defendants.

**DEFENDANT MOTION CONTROL CORPORATION'S THIRD SUPPLEMENTAL ANSWERS TO PLAINTIFF SICK, INC.'S FIRST AND SECOND SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Motion Control Corporation ("MCC") provides the following Answers to Plaintiff SICK, Inc's ("SICK") Interrogatories:

1. Identify all persons who have knowledge relating to any of the allegations made in the Complaint, Answer, or Counterclaim and state the facts of which each person so identified has knowledge.

ANSWER: See Defendant MCC's Initial Disclosures. Discovery is continuing.

PREVIOUS SUPPLEMENTAL ANSWER:

Linda Pryce - Motion Control Corporation

Ms. Pryce has knowledge relative to the sales and purchases of products by MCC and MCC's sales and purchases reporting system.

Carmen Munoz
Michigan Minority Business Development Council
3011 West Grand Boulevard, Suite 230
Detroit, MI 48202

Ms. Munoz has knowledge regarding CIC's certification as a minority-owned business. Ms. Munoz also has knowledge regarding the development of minority-owned businesses in Michigan and the certification standards of the MMBDC.

Marty Radelt
General Motors Corporation

Mr. Radelt is expected to have knowledge regarding the meetings relating to the GM/SICK Blanket Agreement and CIC's expected role as an authorized supplier of SICK products under the GM Blanket. Mr. Radelt is additionally expected to have knowledge of MCC's efforts to sell SICK products in Michigan.

Dick Miller
RS Electronics

Mr. Miller has industry knowledge about distribution and commodity supply relationships in the Michigan market and the impact of the specification process on the distributor/manufacturer relationship. Mr. Miller also has knowledge regarding the sales reporting requirements for a distributor in Michigan. Mr. Miller also has knowledge regarding meetings involving Ford, MCC and CIC relative to the sale of SICK products.

**THIRD SUPPLEMENTAL ANSWER:**

Mike Petersen and Ken Solomon of Ford are believed to have information regarding the Ford to Furnish project and bidding process, including, but not limited to, information relating to STI's agreement with SICK that allowed STI to supply SICK PLS units.

2. Identify each person whom you expect to call as an expert witness at trial. With respect to each "expert":

a. State the area of expertise and the basis for expertise;

b. Provide a list of any publications, papers and treatises;

c. State the subject matter on which the expert is expected to testify;

d. State the substance of the facts and opinions to which the expert is expected to testify; and

e. Give a summary of the individual grounds for each opinion.

**THIRD SUPPLEMENTAL ANSWER:**

Philip S. Williams, Larson, Allen, Weishair & Co., LLP. Mr. Williams has previously been identified and his reports have been produced to Plaintiff. Mr. Williams will testify consistent with the reports that have been produced. Mr. Williams will additionally prepare a report and testify regarding damages suffered by MCC arising from Plaintiff's actions after October 5, 2001.

3. If you have retained or specifically employed an expert whom you do not expect to call as a witness at trial, state his or her name, address, business affiliation, and dates of employment relative to the subjects of this litigation.

ANSWER: Not applicable.

4. Identify all persons whom you intend to or may call as a witness at the time of the trial. Please include a summary of each witness potential or expected testimony.

ANSWER: Defendant has not yet identified witnesses to be called at trial. Witnesses will be disclosed consistent with the Scheduling Order and/or Trial Order.

5. Identify all documents and exhibits that you intend to or may introduce as evidence at the time of trial.

ANSWER: Defendant has not yet identified documents and exhibits to be used at trial. These will be disclosed consistent with the Scheduling Order and/or Trial Order.

6. Identify all statements concerning this action or its subject matter within the meaning of Fed. R. Civ. P. 26.02(3).

ANSWER: Numerous depositions were taken in the previous arbitrations between the two parties. The depositions from the arbitrations in MCC's possession are:

| | |
|---|---|
| Bahr, Joe | June 14, 2001 |
| Bertomeu, Alberto | December 5, 2001 |
| Bondy, Richard | April 27, 2001 |
| Borsvold, Jeff | May 1, 2001 |
| Butler, Laurie | April 26, 2001 & November 27, 2001 |
| Carene, David | November 27, 2001 |
| Churchill, Robert | April 27, 2001 |
| Freedman, Steven | May 30, 2001 |
| Giamo, Jon | November 27, 2001 |
| Hale, Margaret | November 27, 2001 |
| Hankinson, Wilbur | April 26, 2001 & November 27, 2001 |

| | |
|---|---|
| Karty, Paul | May 1, 2001 & November 27, 2001 |
| Killinger, Dennis | April 26, 2001 & November 27, 2001 |
| Klick, Amy | May 30, 2001 |
| Kremer, Mark | April 27, 2001 |
| Kucharski, Gary | April 27, 2001 |
| Lentz, Rex | November 27, 2001 |
| Magnuson, Kirk | November 27, 2001 |
| Malcoun, Michael | July 12, 2001 |
| McHallam, Scott | November 27, 2001 |
| Naber, Richard | November 27, 2001 |
| Payne, Darrell | November 27, 2001 |
| Penning, Mark | May 30, 2001 |
| Pryce, Linda | April 26, 2001 |
| Pryce, Richard | April 26, 2001 & November 27, 2001 |
| Quaine, Kevin | April 26, 2001 & November 27, 2001 |
| Quaine, Michael | April 26, 2001 |
| Quaine, Russ | May 1, 2001 & December 5, 2001 |
| Rorai, Blake | November 27, 2001 |
| Snider, Gregory | April 27, 2001 & May 1, 2001 |

Additional depositions have been taken in the federal action. MCC assumes that these depositions are in Plaintiff's possession. Upon request, the depositions will be produced for inspection and copying at the offices of MCC's counsel at mutually convenient time and date.

7. State all facts that form the basis, grounds, reasons, or are asserted by MCC with respect to the contention in Paragraph 8 of its counterclaim that "MCC terminated its relationship and contract with Dolan-Jenner and invested a significant amount of money in the expansion of its facility to handle SICK's additional product lines."

ANSWER: MCC terminated a 17 year relationship with Dolan-Jenner on October 1, 1998 in preparation for an expected long-term relationship with SICK, Inc. During the time frame that MCC was in negotiations with SICK, MCC was in the process of investing in a new facility with office, technical service and warehouse space. As a result of MCC's intention to proceed into a long term relationship with SICK, the build out of MCC's facility was designed in a fashion to better handle the distribution, service and training for SICK's product lines. MCC also invested significant time and expense training its sales personnel and employees in reliance on the expectation that it was embarking on a long-term partnership relationship with SICK. Discovery regarding additional expenses and costs is continuing.

PREVIOUS SUPPLEMENTAL ANSWER:

MCC terminated a 17 year relationship with Dolan-Jenner on October 1, 1998 in preparation for an expected long-term relationship with SICK, Inc. During the time frame that MCC was in negotiations with SICK, MCC was in the process of investing in a new facility with office, technical service and warehouse space. As a result of MCC's intention to proceed into a long term relationship with SICK, the build out of MCC's facility was designed in a fashion to better handle the distribution, service and training for SICK's product lines. MCC also invested significant time and expense training its sales personnel and employees in reliance on the expectation that it was embarking on a long-term partnership relationship with SICK. Discovery regarding additional expenses and costs is continuing.

SECOND SUPPLEMENTAL ANSWER:

MCC incurred the following costs in connection with the expansion of its facility as part of its decision to enter into the 1998 Distribution Agreement with SICK:

Change orders relating to the build out of MCC's facility that relate, in whole or in part, to MCC's decision to enter into the relationship with SICK resulted in $161,434 in additional expenditures for the facility.

MCC incurred additional expenses in reliance upon the expectations of its agreement with SICK as follows:

1. MCC's initial stock order for SICK product was in excess $600,000.

2. MCC incurred in excess of $30,000 for the purchase of demonstration kits for SICK products

3. MCC incurred approximately $10,000 in expenses relating to the training of its personnel, which would include airfare and hotel expenses for personnel to travel to Minnesota

4. The value of the time of MCC's personnel to initially be trained in the SICK line of products was approximately $230,000 based upon an hourly rate of approximately $386, derived from MCC's 1996 -1998 sales figures and MCC's staffing levels for sales personnel.

8. State all facts that form the basis, grounds, reasons, or are asserted by MCC with respect to the contention in Paragraph 8 of its counterclaim that "based on representations made by SICK, it was MCC's understanding that SICK did not have any sales personnel in Michigan who pursued direct sales prior to October 1998, and any sales that were made directly by SICK to

a customer were subject to the commission arrangement with a manufacturers' sales representative."

ANSWER: During negotiations leading to the execution of the October 8, 1998 Agreement, MCC and SICK engaged in due diligence which included identifying its respective personnel with sales responsibility in Michigan. At that time, SICK advised MCC that it did not employ sales personnel with responsibility to pursue direct sales in the territory. SICK additionally advised, and MCC was aware from its activity in the territory, that direct product sales made by SICK into the territory were handled by a manufacturer's sales representative. The identified sales representative was Joe Rotole.

SECOND SUPPLEMENTAL ANSWER:

MCC supplements its previous response to its Answer to this Interrogatory as follows: During the negotiations of the 1998 Distribution Agreement, SICK never indicated that it intended to pursue direct transactional sales to customers because it had not undertaken such sales in any significant fashion prior to October 1998. Moreover, MCC replaced the entire sales channel that SICK had in place, which constituted a distribution network and a sales representative.

**THIRD SUPPLEMENTAL ANSWER:**

The most significant sticking point in the negotiations leading to the 1998 Distributor Agreement was whether MCC would be an exclusive distributor. MCC demanded total exclusivity, and negotiations were terminated because SICK was reluctant to grant exclusivity. The next day, Mark Penning informed MCC that SICK would agree to MCC being the exclusive distributor for SICK sales.

9. Identify all person who have any knowledge about each of the matters set forth in response to Interrogatory No. 8 above, and for each such person, state the nature of their knowledge or information.

ANSWER: Russ Quaine, Paul Karty and Mike Malcoun participated in the discussions and negotiations with SICK personnel relating to the level of SICK's staffing in the territory prior to October 1998. Additionally other persons including, but not limited to, Bill Schaldenbrand, Richard Mills, Steve Freedman and Mark Penning would have knowledge relative to SICK's distribution and sales efforts and personnel in Michigan prior to October 1998. All of these persons have general knowledge regarding the discussions related to personnel and staffing levels. The specific knowledge of each individual was addressed in part in deposition testimony in the previous arbitrations, and additional specific information can be determined through depositions.

PREVIOUS SUPPLEMENTAL ANSWER:

In addition to the persons identified previously, Jeff Osterhues, Dave Fletcher, Dave Lagerstrom and Wolfgang Windau have knowledge regarding SICK's distribution network and channel prior to October 1998.

**THIRD SUPPLEMENTAL RESPONSE:**

MCC believes that James Tanner, formerly of MCC, may have knowledge relating to MCC's proposed arrangements or negotiations with SICK.

10. Identify all communications made by anyone associated with Plaintiff to Defendant MCC with respect to any deficiencies, inadequacies, shortcomings, or other issues under the Distributor Agreement, and for each such matter state the following:

a. The identity of the persons involved in the communication;

b. The time, date, and place of communication;

c. The substance of the communication;

d. Any response by Defendant to the communication; and

e. The identity of all documents regarding, reflecting, concerning, pertaining to, or evidencing the communication.

ANSWER: MCC objects to this interrogatory to the extent that it is overly broad and unduly burdensome. Subject to and without waiving those objections, SICK advised MCC of purported deficiencies in letters dated March 3, 2000, September 28, 2000, November 6, 2000, July 2, 2001 and August 23, 2001. Defendant responded to the allegations made in these specific letters with letters dated March 17, 2000, October 16, 2000, November 3, 2000, July 20, 2001 and August 21, 2001. Additionally, a few meetings were held in which purported deficiencies were identified by SICK. One specific date was a meeting at MCC's facility on September 28, 2000. Additionally, numerous correspondence, documentation and briefs have been exchanged by the parties legal counsel relative to the two previous arbitrations, SICK's third notice of termination and this action. Personnel from SICK also testified at the previous arbitration proceedings, and exhibits were also offered at the two arbitrations. MCC presumes that SICK has copies of these referenced communications. If SICK does not have copies, MCC will produce the referenced communication for inspection and copying at the offices of MCC's counsel at mutually convenient time and date.

PREVIOUS SUPPLEMENTAL ANSWER:

MCC objects to this interrogatory to the extent that it is overly broad and unduly burdensome. Subject to and without waiving those objections, SICK advised MCC of purported deficiencies in letters dated March 3, 2000, September 28, 2000, November 6, 2000, July 2, 2001 and August 23, 2001. Defendant responded to the allegations made in these specific letters with letters dated March 17, 2000, October 16, 2000, November 3, 2000, July 20, 2001 and August 21, 2001. Additionally, a few meetings were held in which purported deficiencies were identified by SICK. One specific date was a meeting at MCC's facility on September 28, 2000. Additionally, numerous correspondence, documentation and briefs have been exchanged by the parties legal counsel relative to the two previous arbitrations, SICK's third notice of termination and this action. Personnel from SICK also testified at the previous arbitration proceedings, and exhibits were also offered at the two arbitrations. MCC presumes that SICK has copies of these referenced communications. If SICK does not have copies, MCC will produce the referenced communication for inspection and copying at the offices of MCC's counsel at mutually convenient time and date.

11. Identify all persons who you claim are MCC employees who have devoted time to marketing and sales of Dolan-Jenner or other products competitive with SICK Products in the Territory. For each person identified in this Interrogatory:

a. Provide the start date and last date of employment; and

b. Identify and list all account assignments.

ANSWER: MCC objects to this Interrogatory to the extent that it is unlimited in time frame and is otherwise vague and argumentative. Subject to and without waiving those objections, MCC states that its employees and sales personnel for the Eastern Michigan territory have not devoted time to marketing and selling Dolan-Jenner products or other products competitive to SICK at any time after January 1, 1999. Any sales or marketing of customers who previously purchased Dolan-Jenner products from MCC was devoted to the marketing and sale of SICK products and the effort to transition customers to purchase SICK products. Additionally, once MCC was appointed the exclusive Master Distributor for SICK products for the Western Michigan territory on July 1, 1999, MCC's sales personnel in Western Michigan, which have been previously identified as Bill Hankinson and Jon Giamo, have not devoted time to the marketing and sale of Dolan -Jenner products. A listing of MCC's sales personnel when the 1998 Distributor Agreement was signed is contained on the Distributor Questionnaire that was initially provided to SICK in October 1998. This document was presented by SICK as Exhibit 17 in the second arbitration between the parties. MCC generally

provided start dates and last dates of employment for its sales personnel in Exhibit 2E2 at page 2 in the recent arbitration before Arbitrator Solum.

12. For each such person identified in Interrogatory No. 11, please identify and describe the nature of that person's compensation for sales made, including but not limited to whether they are commissioned employees or salaried employees.

ANSWER: MCC objects to this Interrogatory to the extent that it is unlimited in time frame and is otherwise vague and argumentative. Subject to and without waiving those objections, MCC's response to Interrogatory number 11did not identify any MCC employees who devoted time to the marketing and sale of Dolan-Jenner products or any other competitive products at any time relevant to the 1998 Distributor Agreement.

13. Identify all persons who assisted in and were part of the effort and ultimate formation of Commerce Industrial Controls, Inc.

ANSWER: MCC objects to this interrogatory to the extent it is vague and overly broad. Subject to and without waiving those objections, Leo Padilla, Russ Quaine, Paul Karty, Mike Quaine and Ray Francis played a role in the "effort and ultimate formation of" MAP Industrial Controls which is now known as Commerce Industrial Controls, Inc. MCC also refers Plaintiff to the Affidavits of Russ Quaine and Leocadio Padilla that were submitted in opposition to Plaintiff's Motion for a Preliminary Injunction.

14. For those persons identified in Interrogatory No. 13, explain and describe the actions or roles taken by each in the formation of CIC.

ANSWER: MCC objects to this Interrogatory to the extent that it is vague and ambiguous. Subject to and without waiving those objections, MCC states that the following people were generally involved in the formation of CIC and its predecessor, M.A.P. Industrial Controls.

| Person | Role or Action |
|---|---|
| **Russ Quaine** | **Mr. Quaine is a shareholder in CIC. He participated in discussions leading to the formation of M.A.P. Industrial Controls.** |
| **Paul Karty** | **Mr. Karty is a shareholder in CIC. He participated in discussions leading to the formation of M.A.P. Industrial Controls.** |

| | |
|---|---|
| **Leo Padilla** | **Mr. Padilla is a shareholder in CIC. He participated in discussions leading to the formation of M.A.P. Industrial Controls.** |
| **Mike Quaine** | **Mr. Quaine provided assistance in the corporate formation of M.A.P. Industrial Controls and to change its name to Commerce Industrial Controls, Inc.** |
| **Ray Francis** | **Mr. Francis is MCC and CIC's accountant that was involved in the formation of M.A.P. Industrial Controls.** |

15. Provide a detailed accounting of all sales of products competitive to products of SICK from January 1, 1996 to the present.

ANSWER: MCC objects to this Interrogatory to the extent that it is vague as to the definitions of "detailed accounting" and "products competitive to products of SICK." MCC also objects to the Interrogatory to the extent that it seeks information from a time frame not relevant to this action. Subject to and without waiving those objections, MCC identified sales figures for Dolan-Jenner products in connection with Request numbers 4 and 5 in the first arbitration between the parties. MCC's response to SICK's document requests were submitted by SICK as Exhibit 42 in connection with the second arbitration between the parties. MCC is currently attempting to determine whether the information in Responses 4 and 5 is accurate. MCC additionally provided sales information regarding Dolan-Jenner products in the first arbitration at Volume 1, Tab 2 with its submitted Exhibits. MCC also submitted information regarding its Dolan-Jenner sales in Tab 1, page 2 of its Exhibit Book submitted in connection with the second arbitration. MCC also refers Plaintiff to the documents submitted in response to Document Request number 19.

PREVIOUS SUPPLEMENTAL ANSWER:

MCC objects to this Interrogatory to the extent that it is vague as to the definitions of "detailed accounting" and "products competitive to products of SICK." MCC also objects to the Interrogatory to the extent that it seeks information from a time frame not relevant to this action. Subject to and without waiving those objections, MCC identified sales figures for Dolan-Jenner products in connection with Request numbers 4 and 5 in the first arbitration between the parties. MCC's response to SICK's document requests were submitted by SICK as Exhibit 42 in connection with the second arbitration between the parties. MCC is currently attempting to determine whether the information in Responses 4 and 5 is accurate. MCC additionally provided sales information regarding Dolan-Jenner products in the first arbitration at Volume 1, Tab 2 with its submitted

Exhibits. MCC also submitted information regarding its Dolan-Jenner sales in Tab 1, page 2 of its Exhibit Book submitted in connection with the second arbitration. MCC also refers Plaintiff to the documents submitted in response to Document Request number 19.

16. State all facts that form the basis, grounds, reasons, or are asserted by MCC with respect to the contention in Paragraph 15 that "SICK" has continued to place direct sales in Michigan and has been undercutting MCC's priority on sales to its customers, as well as allowing other distributors to sell its products in Michigan.

ANSWER: MCC objects to this interrogatory to the extent it is overly broad and unduly burdensome. Subject to and without waiving those objections, SICK has admitted undertaking direct sales at the accounts identified in Exhibits 27, and 43 offered by Plaintiff in Arbitration 2. Additionally, based on MCC's current information, Plaintiff has placed or sought to place direct sales and/or engaged in price cutting or competition with MCC or has allowed other distributors to supply or price SICK products in connection with the following accounts and/or projects:

ComauPico, CEC Controls, Kawaski, Ford, DaimlerChrysler, Chrysler HB and LX, Mercedes program, Egemin, Bosch Packaging, Labor Aid Systems, Benteler, Kellogs, Pharmacia Upjohn, Perrigo, Johann A. Krause, Tesco, Fori, Designed Conveyor Systems, Distribution Planning, Inc., Gordon Food Service, Ermanco, Siemens Dematic, Kore, Inc., General Motors, Graybar, Flowserd, Ingersoll Cinetic, Visteon, Kuka, EDS, Utica Engineering and Burton Industries. MCC also refers Plaintiff to the documents produced in response to Document Request numbers 17 and 18.

PREVIOUS SUPPLEMENTAL ANSWER:

MCC objects to this interrogatory to the extent it is overly broad and unduly burdensome. Subject to and without waiving those objections, SICK has admitted undertaking direct sales at the accounts identified in Exhibits 27, and 43 offered by Plaintiff in Arbitration 2. Additionally, based on MCC's current information, Plaintiff has placed or sought to place direct sales and/or engaged in price cutting or competition with MCC or has allowed other distributors to supply or price SICK products in connection with the following accounts and/or projects:

ComauPico, CEC Controls, Kawaski, Ford, DaimlerChrysler, Chrysler HB and LX, Mercedes program, Egemin, Bosch Packaging, Labor Aid Systems, Benteler, Kellogs, Pharmacia Upjohn, Perrigo, Johann A. Krause, Tesco, Fori, Designed Conveyor Systems, Distribution Planning, Inc., Gordon Food Service, Ermanco, Siemens Dematic, Kore,

Inc., General Motors, Graybar, Flowserd, Ingersoll Cinetic, Visteon, Kuka, EDS, Utica Engineering and Burton Industries. MCC also refers Plaintiff to the documents produced in response to Document Request numbers 17 and 18.

**THIRD SUPPLEMENTAL ANSWER:**

Since October 5, 2001, Plaintiff has placed or sought to place direct sales and/or engaged in price cutting or competition with MCC or has allowed other distributors to supply or price SICK products in connection with the following accounts and/or projects:

SICK utilized brand label agreements with Allen Bradley and Schmersal. SICK sold direct to Die-Mation Engineering. SICK sold direct to Durr Automation. SICK allowed Cornerstone Electrical Group to sell SICK products to Engineering Design & Controls. SICK continued to sell non-NACCL SICK products through Graybar. SICK sold direct to Tesco through IM Purchasing.com. SICK allowed McNaughton & McKay to sell SICK products to Vantage for Visteon plants and RS Electronics. SICK sold direct to Paslin. SICK sought to set pricing for the DCX blanket. SICK sold direct to Delta Tube. SICK quoted and sought to sell SICK products to Ford Motor, Wayne Assembly Plant. SICK offered pricing to Anheuser Busch that would have required MCC to reduce its margins. SICK quoted pricing at Henshaw Electric that required MCC to place an order at 15% margin. SICK is believed to have sold direct or through other distributors to Schlafhorst, DT Peer Industries, ABB, SSAB Hardtech, Inc., ASE Industries and Square D. SICK entered into an agreement with STI that allowed STI to offer the SICK PLS units on the Ford to Furnish program.

Discovery is continuing.

17. Set forth in detail and identify your claimed damages, and state how your damages are calculated.

ANSWER: See MCC's Initial Disclosures.

**THIRD SUPPLEMENTAL RESPONSE:**

See reports of Philip S. Williams previously produced for damages alleged prior to October 5, 2001. After October 5, 2001, MCC continued to incur expenses for personnel, training, promotion, travel, entertainment, auto expense, employee benefits, rent, taxes and utilities relating to the operations of its business. These expenses were significantly increased due to the personnel requirements under the 1998 Distributor Agreement. Despite SICK's breaches of the agreement, MCC attempted to meet its obligations under the agreement and incurred reliance damages as a result. MCC also lost sales and reduced margins as a result of SICK's actions with customers and accounts in the territory after October 5, 2001. Discovery is continuing.

18. Identify all MCC customer relationships you claim Plaintiff has misappropriated and/or converted as alleged in Paragraph 28 of your counterclaim.

ANSWER: MCC refers Plaintiff to its Answer to Interrogatory No. 16 and the documents produced in response to Document Request numbers 17 and 18. Discovery is continuing.

SECOND SUPPLEMENTAL ANSWER:

In supplementation of its prior Answer to this Interrogatory, MCC additionally refers Plaintiff to the documents produced in response to Document Requests 18 & 27.

**THIRD SUPPLEMENTAL ANSWER:**

See MCC's Third Supplemental Answer to Interrogatory Number 16. Discovery is continuing.

19. Identify all MCC customers which you claim as alleged in paragraph 33 of your counterclaim that Plaintiff directly approached and undercut MCC prices.

ANSWER: MCC refers Plaintiff to its Answer to Interrogatory No. 16 and the documents produced in response to Document Request numbers 17 and 18. Discovery is continuing.

SECOND SUPPLEMENTAL RESPONSE:

In supplementation of its prior Answer to this Interrogatory, MCC additionally refers Plaintiff to the documents produced in response to Document Requests 18 & 27.

**THIRD SUPPLEMENTAL ANSWER:**

See MCC's Third Supplemental Answer to Interrogatory Number 16. Discovery is continuing.

20. Identify all parties and individuals that received commissions or any form of compensation relating to the sale or distribution of SICK products through CIC.

ANSWER: MCC objects to this interrogatory to the extent that it is vague. Subject to and without waiving those objections, MCC refers Plaintiff to the documents produced in response to Document Request No. 13. Discovery is continuing.

21. Identify all parties that received SICK products distributed, sold or in any way disseminated through or by CIC.

ANSWER: MCC objects to this interrogatory to the extent that it is vague, overly broad, and unduly burdensome. Subject to and without waiving those objections, this information can be obtained from CIC.

22. Identify and describe the compensation paid to CIC for distribution, sales or any dissemination of SICK products by CIC for MCC.

ANSWER: CIC has not received compensation from MCC for distribution, sale or dissemination of SICK products.

23. For those direct sales accounts identified in MCC's Answer to Interrogatory No. 16 and all other sales accounts MCC maintains SICK was selling direct to identify the MCC employees assigned to those accounts; all sales efforts made by such MCC employees, and identify all monies expended for such efforts by MCC.

ANSWER: Defendant MCC objects to this Interrogatory to the extent that it is overly broad and unlimited in scope or time frame. Subject to and without waiving those objections, MCC responds as follows:

| | |
|---|---|
| COMAU | SHARED |
| CEC | K.QUAINE |
| KAWASAKI | K. QUAINE |
| FORD | RICK PRYCE K. QUAINE |
| CHRYSLER | PAYNE |
| EGEMIN | GIAMO |
| BOSCH | GIAMO |
| LABOR AID | GIAMO |
| BENTELER | GIAMO |
| KELLOGGS | TBD |
| PHARMACIA | TBD |
| PERRIGO | HOUSE |
| KRAUSE | MAGNUSON |
| TESCO | MAGNUSON |
| FORI | MAGNUSON |
| D. CONTROL | TBD |
| DIST PLAN | HANKINSON |
| GORDON FOODS | TBD |
| ERMANCO | HANKINSON |
| SIEMENS | HANKINSON LENTZ |
| KORE | HANKINSON |
| GM | VARIOUS |
| GRAYBAR | SHARED |
| FLOWSERD | TBD |

| | |
|---|---|
| INGERSOLL | PRYCE |
| VISTEON | VARIOUS |
| KUKA | CARENE QUAINE |
| EDS | GIAMO |
| UTICA | PAYNE |
| BURTON | MCHALLAM |

**THIRD SUPPLEMENTAL ANSWER:**

| | |
|---|---|
| DIE-MATION | K. QUAINE |
| DURR | K. QUAINE |
| ED & C | K. MAGNUSON |
| SCHLAFHORST | J. GIAMO |
| DT PEER IND. | J. GIAMO |
| SQUARE D | K. QUAINE |
| PASLIN | D. PAYNE |
| DELTA TUBE | S. MCHALLAM |
| FORD MOTOR | |
| WAYNE | K. QUAINE |
| CHRYSLER | |
| WARREN TRUCK | D. PAYNE |
| ABB | D. CARENE |
| HENSHAW ELECTRIC | SHARED |
| ASE INDUSTRIES | K. MAGNUSON |
| SSAB HARDTECH | SHARED |

24. Identify and describe all sales and promotional expenditures from the 1992 to present identifying the purpose of the expense, date of expense and what the expense was incurred for.

ANSWER: Defendant MCC objects to this Interrogatory to the extent that it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving those objections, MCC has produced information relating to promotional expenditures in connection with the previous arbitrations indicating that MCC historically expense 2% of its gross sales for promotion and advertising. MCC will produce documentation to backup the expenses indicated on the financial statements produced to Plaintiff in its offices in Farmington Hills, Michigan at a mutually convenient time and date.

**THIRD SUPPLEMENTAL ANSWER:**

MCC has continued its practice of spending 2% of its gross sales for promotion and advertising. MCC will provide financial statements to corroborate this practice and

produce backup information relative to promotions specific to SICK products at a mutually convenient time and place.

25. Identify and describe the location of all SICK products shipped by MCC or CIC, including the bill to address and the ship to address of the SICK products.

ANSWER: Defendant MCC objects to this Interrogatory to the extent that it is overly broad and unduly burdensome. This information relative to MCC was previously provided in data form to Plaintiff for sales prior to March 1999 when MCC implemented its new computer system. MCC additionally provided point-of-sales information for periods prior to March 1999 both prior to and during the previous arbitrations between the parties. Additionally, MCC will make the backup documentation relating to sales of SICK product in its offices in Farmington Hills, Michigan at a mutually convenient time and date.

**THIRD SUPPLEMENTAL ANSWER:**

MCC refers SICK to the POS reports that have previously been provided in data form to SICK.

26. Identify and describe by date and location all instances and occurrences that you claim SICK has sold direct to customers in the Michigan territory.

ANSWER: Defendant MCC objects to this Interrogatory to the extent that it is overly broad and unduly burdensome. Subject to and without waiving those objections, responsive information within MCC's knowledge has been provided previously. Additionally, SICK has provided sales figures for its direct sales efforts in Michigan. Discovery is continuing.

**THIRD SUPPLEMENTAL ANSWER:**

See MCC's Third Supplemental Answers to Interrogatories 16 and 23.

27. Identify and describe all MCC sales or distribution of products competitive with SICK products made in concert with, in connection with, or with assistance from CIC.

ANSWER: Defendant MCC objects to this Interrogatory to the extent that it is overly broad, argumentative and unlimited in scope or time frame. Subject to and without waving those objections, MCC has not sold products competitive with SICK products that were made in concert with, in connection with, or with assistance from CIC.

28. Identify the bill to address and ship to address of Dolan-Jenner products sold from October 1, 1998 through the present sold or distributed by either MCC or CIC.

ANSWER: MCC provided data identifying sales that were coded as "DJ" sales in its sales reporting system. This data contained products coded as "DJ" that did not include Dolan-Jenner products. MCC is currently in the process of identifying which products given the "DJ" designation are actually Dolan-Jenner products. Once this process is completed, MCC will provide the information to Plaintiff. With regard to sales prior to March 1999, MCC will produce the invoices and other backup data relating to sales of Dolan-Jenner products in its offices in Farmington Hills, Michigan for inspection by Plaintiff at a mutually convenient time and date.

Dated: 6-30-04

MOTION CONTROL CORPORATION

BY [signature]
Its [signature]

Subscribed and sworn to before me
this 30th day of June, 2004

[signature: Sharon Sandberg]
Notary Public

SHARON SANDBERG
NOTARY PUBLIC – MINNESOTA
My Comm. Expires Jan. 31, 2005

**AS TO OBJECTIONS:**

Dated:__________________

LOMMEN, NELSON, COLE & STAGEBERG, P.A.

BY______________________________
Barry A. O'Neil, I.D. No. 220875
Attorneys for Motion Control Corporation
1800 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 339-8131
FAX: (612) 339-8064

Document # 228980

28. Identify the bill to address and ship to address of Dolan-Jenner products sold from October 1, 1998 through the present sold or distributed by either MCC or CIC.

ANSWER: MCC provided data identifying sales that were coded as "DJ" sales in its sales reporting system. This data contained products coded as "DJ" that did not include Dolan-Jenner products. MCC is currently in the process of identifying which products given the "DJ" designation are actually Dolan-Jenner products. Once this process is completed, MCC will provide the information to Plaintiff. With regard to sales prior to March 1999, MCC will produce the invoices and other backup data relating to sales of Dolan-Jenner products in its offices in Farmington Hills, Michigan for inspection by Plaintiff at a mutually convenient time and date.

Dated:________________ MOTION CONTROL CORPORATION

BY____________________________
Its____________________________

Subscribed and sworn to before me
this _____ day of _________, 2004

____________________________
Notary Public

**AS TO OBJECTIONS:**

Dated: June 21, 2004

LOMMEN, NELSON, COLE & STAGEBERG, P.A.

BY Barry A. O'Neil

Barry A. O'Neil, I.D. No. 220875
Attorneys for Motion Control Corporation
1800 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 339-8131
FAX: (612) 339-8064

Document # 228980